IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>*v.*<br><br>**KEVIN L. KIRTON** | Criminal Action No.<br><br>1:19-CR-00222-WMR-JFK |

### United States' Opposition to Motion to Suppress Evidence

The United States of America, by Byung J. Pak, United States Attorney, and Samir Kaushal, Assistant United States Attorney for the Northern District of Georgia, files this Opposition to defendant Kevin L. Kirton's motion to suppress evidence obtained from the execution of a search warrant at his residence. The motion should be denied without a *Franks v. Delaware*, 438 U.S. 154 (1978), hearing.

### Facts and Procedural History

On January 21, 2014, a Magistrate Judge authorized a search warrant for Kirton's residence in College Park, Georgia. (*See* Doc. 34-1 at 1.)[1] The next day, law enforcement searched the residence. Kirton now seeks to suppress the fruits of that search, claiming that the 27-page affidavit describing a confidential informant's two proffer sessions, three recorded undercover operations with Kirton at Kirton's residence, and one recorded phone call with Kirton—all of which

---

[1] Citations to "Doc. _" refer to docket entries in this case.

pertained to the creation of fake driver's licenses and Kirton's filing of fraudulent federal tax returns—lacked probable cause. (Doc. 34 at 2–4.) Kirton also accuses the affiant of the serious charge of including intentionally false and recklessly misleading statements in the affidavit and asks for a *Franks* hearing. (*Id.* at 4–15; Doc. 37 at 4–6.)

The affidavit states that there was probable cause to search Kirton's residence for evidence of violations of Title 18, United States Code, Sections 287 (false claim), 371 (conspiracy), 641 (theft of government property), 1028 (identity theft), 1028A (aggravated identity theft), and 1344 (bank fraud). (Doc. 34-1 at 1.) The affidavit began with an introduction to the investigation and the affiant's background. (*Id.* ¶¶ 1–5.) It then described the confidential informant, CI1, explaining that CI1 was the target of a federal investigation that cooperated with law enforcement and wished to obtain a better result in his/her criminal case. (*Id.* ¶¶ 12–13.) The affidavit listed CI1's criminal convictions, dating back 17 years, to 1997. (*Id.* ¶ 14.) And, because the affidavit discussed computer technology, it noted that CI1 had "no expertise or special training in the operation of computer systems." (*Id.* ¶ 15.)

After describing CI1, the affidavit turned to Kirton, explaining that he is using a computer application he created (the "Tax Fraud Program") to file fraudulent income tax returns:

> Kirton's fraudulent tax return scheme, according to CI1 and corroborated by USSS surveillance operations, involves a computer application, created and maintained by Kirton, utilized to file fraudulent federal income tax returns with the Internal Revenue Service in the names of stolen identities. The resulting tax refunds are ultimately direct deposited into fraudulent bank accounts, some of which were provided to Kirton by CI1, and also into pre-paid debit cards controlled by Kirton.

(*Id.* ¶ 16.)

The affidavit explains that, on October 29 and 31, 2013, CI1 proffered with law enforcement. (*Id.* ¶¶ 18–41.) During the proffers, CI1 described Kirton and explained that the two had previously conducted an auto loan fraud scheme and established a fake collections business. (*Id.* ¶¶ 19–22.) CI1 also described a computer program that Kirton had created that could be used to file fraudulent tax returns: the Tax Fraud Program. (*Id.* ¶ 23.) CI1 provided details regarding the Tax Fraud Program (*id.*), including that Kirton had made a tutorial for it to train users (*id.* ¶ 25) and that Kirton had multiple users using the program (*id.* ¶ 34). CI1 also said that he had seen information related to tax fraud on Kirton's phone. (*Id.* ¶¶ 27, 38.)

About a month later, on November 25, 2013, CI1 conducted an undercover, recorded operation at Kirton's residence. (*Id.* ¶ 42.) During the operation, CI1 and Kirton discussed Kirton's fraudulent tax return scheme, including the use of the computer program that Kirton had created. (*Id.* ¶ 44.) They also discussed the creation of three fake driver's licenses. (*Id.* ¶ 43.) After the operation, CI1 debriefed with law enforcement and provided details of what occurred during the meeting. (*Id.* ¶ 45.)

About two weeks later, on December 9, 2013, CI1 conducted a second undercover, recorded operation at Kirton's residence. (*Id.* ¶ 46.) During this operation, CI1 provided Kirton with a new laptop to be configured to access the Tax Fraud Program. (*Id.*) Kirton discussed methods for filing fraudulent tax returns and withdrawing fraudulently obtained funds from ATMs. (*Id.* ¶¶ 47(b)–(m).) Kirton also showed CI1 the Tax Fraud Program, discussed its use, and stated that he will configure the program so that CI1 can log into the program. (*Id.* ¶¶ 47(f)–(j).) The two also discussed the status of the fake driver's licenses. (*Id.* ¶ 47(a).) After the operation, CI1 debriefed with law enforcement and provided details of what occurred during the meeting. (*Id.* ¶¶ 48–49.)

A week later, CI1 conducted an undercover, recorded phone call with Kirton on December 16, 2013, to follow up on discussions that occurred in the prior undercover operations. (*Id.* ¶ 50.) And on January 15, 2014,

CI1 met with Kirton again, for a third time, at Kirton's residence. (*Id.* ¶ 51.) This meeting, like the other two, was recorded. (*Id.*) During this meeting, Kirton gave CI1 access credentials for the Tax Fraud Program and accessed the program while CI1 observed him. (*Id.*) After the meeting, CI1 logged into the Tax Fraud Program in the presence of the affiant and other law enforcement. (*Id.* ¶ 52.)

## Argument

Kirton's motion to suppress fails to undermine the Magistrate Judge's finding of probable cause or demonstrate wrongdoing or recklessness by the affiant sufficient to merit a *Franks* hearing. On probable cause, Kirton offers boilerplate bereft of any non-conclusory allegations that would undermine the Magistrate Judge's finding. And, in any event, the *Leon* good faith exception to the exclusionary rule would apply so no evidence should be suppressed. Kirton's attack on the affiant under *Franks* likewise fails. It does not come anywhere close to approaching the evidentiary threshold that must be crossed to justify holding a hearing. A defendant must earn a *Franks* hearing by making a substantial preliminary showing, through evidence, of wrongdoing or recklessness. Kirton has presented nothing of the sort. But even if he had, he still is not entitled to a *Franks* hearing. The affidavit establishes probable cause to search his residence even after including the information he claimed was omitted and setting aside the paragraphs he has challenged.

5

**1. The affidavit established probable cause to search Kirton's residence.**

Kirton offers nothing to undermine the Magistrate Judge's probable cause finding other than a single conclusory allegation that "the affidavit . . . did not on its face contain sufficient information to establish probable cause[.]" (Doc. 34 at 3.) This allegation fails to meet the level of specificity needed for this Court to act. "A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented." *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985); *United States v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984) (explaining that if "a motion to suppress fails to allege facts that . . . would require the grant of relief, the law does not require that . . . a hearing [be held] independent of the trial to receive evidence on any issue necessary to the determination of the motion"). "Conclusory allegations and general assertions are insufficient." *United States v. Leiva-Portillo*, No. 1:06-CR-350, 2007 U.S. Dist. LEXIS 100919, at *18 (N.D. Ga. Apr. 12, 2007). The few words offered here are insufficient to proceed, so the challenge to probable cause fails even before turning to the affidavit's content.

This said, the affidavit's content provided ample probable cause. "Probable cause . . . exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." *United States v. Brundidge*, 170 F.3d

6

1350, 1352 (11th Cir. 1999). It is "a fluid concept—turning on the assessment of probabilities in particular factual contexts." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). A fair probability exists "when the facts and circumstances would lead a reasonably prudent person to believe that the place to be searched contains contraband or evidence of a crime." *United States v. Noriega*, 676 F.3d 1252, 1261 (11th Cir. 2012).

Neither certainty nor a preponderance of the evidence is required to show probable cause. *See Gates*, 462 U.S. at 246. The affidavit need only "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002). While "'the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity," *id.*, there need not be an allegation that illegal activity occurred at the residence because "the nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation." *United States v. Lockett*, 674 F.2d 843, 846 (11th Cir. 1982). The issuing judge may rely upon the opinions of an experienced agent about where evidence of a crime is likely to be found. *See United States v. Gonzalez*, 969 F.2d 999, 1004 (11th Cir. 1992). Finally, when the affidavit's demonstration of probable cause presents a close call,

"the resolution of doubtful or marginal cases . . . should be largely determined by the preference to be accorded to warrants." *Massachusetts v. Upton*, 466 U.S. 727, 734 (1984).

In reviewing a finding of probable cause, the court's task is not to conduct a *de novo* review, but to determine whether the affidavit viewed as a whole provided a "substantial basis" for the finding of probable cause at the time the warrant was issued. *Id.* at 732–33. The affidavit should not be interpreted "in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994); *United States v. Glass*, No. 1:16-CR-145, 2018 U.S. Dist. LEXIS 179319, at *21 (N.D. Ga. Jan. 23, 2018) ("A court examining a challenge to a search warrant accords great deference to the judicial officer's finding of probable cause.") (internal quotation marks omitted).

Here, looking at the totality of the circumstances, there was ample probable cause to search Kirton's residence. The affidavit set out CI1's criminal background and his knowledge of Kirton's criminal activities. (*See* Doc. 34-1 ¶¶ 12–15, 18–41.) It also described three undercover operations and one phone call with Kirton in which fake driver's

licenses and tax fraud activities, including Kirton's criminal activity, are discussed. (*See id.* ¶¶ 42, 46, 50, 51.)

All three undercover operations occurred at Kirton's residence. (*Id.* ¶¶ 42, 46, 51.) And during those operations, Kirton discussed a slew of tax fraud activity, including his creation and use of the Tax Fraud Program. During the first operation, on November 25, 2013, Kirton "stated that he had used a list of stolen inmate identities provided to him by CI1 to file fraudulent tax returns, but was unsuccessful in acquiring the refunds because the IRS caught the fraudulent tax returns." (*Id.* ¶ 44.) CI1 also asked Kirton to create three fake driver's licenses and "Kirton discussed with CI1 the price charged by a coconspirator who assists him in the preparation of fake driver's licenses." (*Id.* ¶ 43.) After the operation, CI1 explained, *inter alia*, that: (i) Kirton had the Tax Fraud Program on a server (*id.* ¶¶ 45(a), (c)); (ii) Kirton said that he had accounts ready to receive funds from fraudulent tax returns (*id.* ¶ 45(b)); and (iii) Kirton said that he had filed fraudulent tax returns electronically and in paper form (*id.* ¶¶ 45(d), (e)).

During the second operation, on December 9, 2013, Kirton and CI1 discussed the status of the creation of the three fake driver's licenses (*id.* ¶ 47(a)) and various aspects of tax fraud. CI1 supplied Kirton with a computer to be configured to access the Tax Fraud Program. (*Id.* ¶ 46.) He showed his knowledge of tax fraud by discussing methods of

filing fraudulent tax returns through TurboTax and Proseries (*id.* ¶ 47(c)) and countermeasures that the IRS had developed to "restrict[] tax fraudsters from receiving multiple refunds in the same bank account" (*Id.* ¶ 47(d)). Kirton showed CI1 the Tax Fraud Program and how it worked. (*Id.* ¶¶ 47(f)–(i).) Kirton discussed pending tax fraud activity, explaining that he needed additional bank accounts to receive fraudulently obtained tax refunds and that he had "fraudulent refunds of $21K and $25K he had received or had pending from the IRS." (*Id.* ¶¶ 47(k)–(l).) Kirton also promised to set up an account on the Tax Fraud Program for CI1, which he later did in January 2014. (*Id.* ¶ 47(j); *see id.* ¶ 52.) After the operation, CI1 described to law enforcement what he saw on the screen when Kirton showed him the Tax Fraud Program. (*Id.* ¶¶ 49(a)–(b), (d).)

A week after the second operation, on December 16, 2013, CI1 spoke with Kirton by telephone for a status update on the fake driver's licenses and the computer to be used by CI1 to access the Tax Fraud Program. (*Id.* ¶ 50.)

During the third operation, on January 15, 2014, CI1 met with Kirton and Kirton gave CI1 the computer to be used to access the Tax Fraud Program. (*Id.* ¶ 51.) Kirton accessed the Tax Fraud Program from the computer and he also generated a login for CI1 to access the Tax Fraud Program. (*Id.*) After this operation, CI1 logged into the Tax

Fraud Program in the presence of the affiant and other law enforcement. (*Id.* ¶ 52.)

The undercover operations corroborated CI1's description of the Tax Fraud Program that he provided during his proffer sessions. (*Compare id.* ¶¶ 23–25, 34, 36, 39 (describing Tax Fraud Program as explained by CI1 in proffers prior to undercover operations), *with id.* ¶¶ 44, 45(b), 47(f)–(j), 49(b), (d) (describing Tax Fraud Program as explained by Kirton during undercover operations).) Plus all of that was corroborated by the affiant and other law enforcement personally observing CI1 logging into the Tax Fraud Program from a computer. (*Id.* ¶ 52.)[2]

In summary, the affidavit presents information from an informant regarding Kirton's tax fraud activity, describes law enforcement's

---

[2] The use of CI1 did not undermine the probable cause finding. The affidavit established CI1's veracity and basis of knowledge through describing his reason for cooperating with law enforcement, his prior fraud conduct with Kirton, his proffer statements, and his criminal history. (Doc. 34-1 ¶¶ 12–14); *see Martin*, 297 F.3d at 1314 (explaining that affidavit should demonstrate informant's veracity and basis of knowledge). Moreover, CI1's proffer statements were corroborated by undercover operations, culminating in the affiant seeing CI1 log into Kirton's Tax Fraud Program, eliminating the need to establish CI1's veracity. "[W]hen there is sufficient independent corroboration of an informant's information," like undercover operations where the defendant describes his criminal scheme and the affiant sees a component—the Tax Fraud Program—of that scheme firsthand, "there is no need to establish the veracity of the informant." *Id.* (internal quotation marks and citations omitted).

successful efforts to corroborate that information through undercover operations, and ends with law enforcement seeing a core component of Kirton's tax fraud activity, the Tax Fraud Program, firsthand on a computer. Applying practical, common sense, this information certainly provides the "substantial basis" needed for this Court to conclude that the Magistrate Judge correctly found probable cause at the time the warrant was issued. *See Upton*, 466 U.S. at 732–33; *Miller*, 24 F.3d at 1361. Courts of this Circuit have regularly held, albeit mainly in the drug context, that undercover operations like this are powerful means of establishing probable cause. *E.g.*, *United States v. Roundtree*, 299 F. App'x 905, 907 (11th Cir. 2008) ("It is clear that a properly executed controlled buy, . . . is sufficient, standing alone, to establish probable cause.") (unpublished opinion); *United States v. Akel*, 337 F. App'x 843, 857 (11th Cir. 2009) (noting that surveillance of two controlled buys sufficiently corroborated informant) (unpublished opinion).

**2. The *Leon* good faith exception to the exclusionary rule applies to the search.**

In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court established a good faith exception to the exclusionary rule where officers placed reasonably objective reliance on a search warrant later determined to be defective. With the exception of cases "where the issuing magistrate wholly abandoned his judicial role[,]" where "a warrant [is] based on an affidavit so lacking in indicia of probable cause

as to render official belief in its existence entirely unreasonable[,]" and where "a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid[,]" the good faith exception applies. *United States v. Accardo*, 749 F.2d 1477, 1480 n.4 (11th Cir. 1985) (citations and internal quotation marks omitted). The good faith exception "require[s] suppression only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id*. at 1480 (internal quotation marks omitted). In deciding whether the exception applies, the totality of the circumstances surrounding issuance of the search warrant may be considered. *Id*. at 1481.

Here, even if the affidavit did not establish probable cause, the evidence seized from Kirton's residence should not be suppressed because the good faith exception applies. As explained in Section 3, Kirton has failed to make a preliminary evidentiary showing that the affiant either deliberately or with a reckless disregard for the truth included false, material information in the affidavit or omitted material information from the affidavit. And, as explained in Section 1, the search warrant for Kirton's residence was not "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[.]" *Leon*, 468 U.S. at 923 (internal

quotation marks omitted). The affidavit was not a "'bare-bone' statement of nothing more than conclusory allegations." *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998). As explained in Section 1, the affidavit included 14 pages detailing two proffers with CI1, three undercover operations at Kirton's residence, one phone call with Kirton, and the affiant's own firsthand experience viewing the Tax Fraud Program Kirton created, and all of this information showed that Kirton was committing tax fraud and facilitating the production of fake driver's licenses. The affidavit also listed CI1's prior convictions and noted that he had an incentive to want to cooperate with law enforcement—he was hoping to earn credit against any sentence he received in his federal case. (*See* Doc. 34-1 ¶¶ 13–14.) These facts were evaluated by the Magistrate Judge and she authorized the search warrant. The law enforcement officers were, therefore, entitled to rely upon the Magistrate Judge's determination that "given all the circumstances set forth in the affidavit . . . there [was] a fair probability that contraband or evidence of a crime [would] be found in a particular place." *Gates*, 462 U.S. at 238.

### 3.  Kirton is not entitled to a *Franks* hearing.

No offer of proof accompanies Kirton's request for a *Franks* hearing other than one probation revocation document. As such, he has not made the substantial preliminary showing required to obtain a *Franks* hearing. And even if Kirton had made the required preliminary

showing, he still would not be entitled to a *Franks* hearing because the affidavit establishes probable cause even with the information he claimed was omitted and without the paragraphs he challenged.

### 3.1. A *Franks* hearing should be held only if the defendant shows that the affiant made intentionally false or recklessly misleading statements or omissions and those statements or omissions were necessary to find probable cause.

Affidavits supporting search warrants are presumptively valid. *Franks*, 438 U.S. at 171. "Thus, a defendant is generally not entitled to an evidentiary hearing on a motion to suppress based on alleged misrepresentations or omissions in a search warrant affidavit." *United States v. Price*, 582 F. App'x 846, 850 (11th Cir. 2014) (unpublished opinion). Under *Franks*, a hearing should be held only when "a defendant makes a substantial preliminary showing that: (1) a warrant affiant made intentionally false or recklessly misleading statements (or omissions); and (2) those statements, or omissions, were necessary to the finding of probable cause." *United States v. Johnson*, 768 F. App'x 920, 925 (11th Cir. 2019) (describing *Franks* analysis) (unpublished opinion). "The defendant must (1) allege deliberate falsehood or reckless disregard for the truth; (2) specifically point to the allegedly false portions of the warrant affidavit; and (3) provide an offer of proof, including sworn affidavits or otherwise reliable witness statements, or satisfactorily explain the absence of such evidence." *Id.* "If, upon such a

showing, the content in the affidavit remains sufficient to support a finding of probable cause, then no hearing is required." *Id.*

Material omissions from an affidavit may give rise to entitlement to a *Franks* hearing. *See United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009). Insignificant and immaterial omissions, of course, will not invalidate a warrant. *See United States v. Reid*, 69 F.3d 1109, 1114 (11th Cir. 1995). And "merely showing an intentional omission of a fact from a warrant affidavit does not fulfill *Franks'* requirements." *United States v. Tate*, 524 F.3d 449, 455 (4th Cir. 2008). The defendant must also demonstrate the omission was with "the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990). Even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts prevent a finding of probable cause. *United States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir. 1990).

A *Franks* hearing is only merited in cases of omissions in "rare instances." *Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998). "This is so because an allegation of omission potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *United States v. Atkins*, 107 F.3d 1213, 1217 (6th Cir. 1997) (internal quotation marks omitted). An affiant "is not required to include everything he knows about a subject in his affidavit,

16

whether it is material to a finding of probable cause or not." *Tech. Ordnance, Inc. v. United States*, 244 F.3d 641, 649 (8th Cir. 2011). The affiant need not include exculpatory information in search warrant affidavits. *See, e.g., Mays*, 134 F.3d at 816. And not every fact recited in an affidavit must be exactly correct; it must be truthful in the sense that it is believed or appropriately accepted by the affiant as true. *See Franks*, 438 U.S. at 165 (explaining that "probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily").

### 3.2. Kirton has not made a "substantial preliminary showing" that the challenged statements and omissions in the affidavit were deliberately false or demonstrated a reckless disregard for the truth.

Kirton's request for a *Franks* hearing should be denied because he failed to "provide an offer of proof, including sworn affidavits or otherwise reliable witness statements, or satisfactorily explain the absence of such evidence," as required under *Franks*. *Johnson*, 768 F. App'x at 925. To "mandate an evidentiary hearing, the challenger's attack [on the affidavit] must be more than conclusory and must be supported by more than a mere desire to cross-examine." *United States v. Kight*, No. 1:18-CR-169, 2019 U.S. Dist. LEXIS 68619, at *14 (N.D. Ga. Mar. 11, 2019) (internal quotation marks omitted). Far more is required. The defendant must make a "substantial preliminary

showing" in his offer of proof. *Johnson*, 768 F. App'x at 925. And this "substantiality requirement is not lightly met[.]" *United States v. Arbolaez*, 450 F.3d 1283, 1294 (11th Cir. 2006).

Here, the entirety of Kirton's motion lacks evidentiary support, except for one aspect of the challenge to paragraph 14. For that paragraph, Kirton has provided a copy of CI1's October 29, 2002 probation revocation. The challenges to the other paragraphs and other aspects of the challenge to paragraph 14—for example, that CI1's criminal history "presumably" would include the probation revocation (Doc. 34 at 5); that a criminal research specialist's search of Kirton's criminal history "failed to show any criminal history whatsoever," (*id.*); that Kirton knew CI1 for more than four years (*id.* at 7); that "it was public knowledge that Kirton was married and not single," (*id.* at 8); that the affiant "presumably has access to information technology experts who can conduct forensic examination of . . . websites," (*id.* at 9); that CI1 sold a black Mercedes E350 to a dealership (*id.*); that Kirton purchased a silver Mercedes E350 (*id.*); that a Microsoft Surface Pro 2 computer has a different operating system than a smartphone (*id.* at 10); that in the November 25, 2013 surveillance recording "Kirton immediately asked CI1 why he was giving" him documents for fake driver's licenses (*id.* at 11); that "November is too early to file tax returns," (*id.*); and that in the December 16, 2013 phone recording "there is no mention by Kirton or CI1 . . . of preparing the computer to

use it in furtherance of their fraud[u]lent tax return scheme," (Doc. 37 at 2)—all lack evidentiary support. And while Kirton takes issue with many paragraphs of the affidavit, it is hard to find in Kirton's motions the clear allegations of intentional falsehoods or reckless disregard for the truth required for a *Franks* hearing. *See Johnson*, 768 F. App'x at 925.

Kirton offers no affidavits or other sworn statements, no transcripts, no recordings, and no explanation for the absence of such evidence. Referring to purported evidence, knowledge, or statements without an offer of proof is not enough to merit a *Franks* hearing. *See Arbolaez*, 450 F.3d at 1294 (finding that defendant failed to make "substantial preliminary showing" where there was no "affidavit or otherwise sworn statement alleging that [the affiant] knowingly or recklessly included false statements in the search warrant affidavit"); *United States v. Montemayor*, No. 1:09-CR-00551, 2018 U.S. Dist. LEXIS 160966, at *36 (N.D. Ga. Aug. 27, 2018) (rejecting idea that court should, "by inference[,] . . . conclude that any misrepresentations or omissions made by the affiants was knowingly or recklessly made, as opposed to negligently or unintentionally, [where] there are no affidavits or sworn statements accompanying [d]efendant's brief establishing this element of proof").

For example, in *United States v. Mealor*, No. 2:18-CR-005, 2018 U.S. Dist. LEXIS 219255 (N.D. Ga. Oct. 9, 2018), the court did not credit the

defendant's reference to reports from victims about an assault because witness statements were not attached to the defendant's motion. *Id.* at *12. The same reasoning applies here. Thus, the vast majority of Kirton's allegations fail from the outset. *E.g.*, *United States v. Green*, No. 4:09-CR-34, 2010 U.S. Dist. LEXIS 150519, at *14-15 (N.D. Ga. Apr. 13, 2010) (explaining that assertions "only upon 'information and belief' that [affiant] made a misrepresentation [are] clearly . . . insufficient to entitle defendant to a hearing"); *see Montemayor*, 2018 U.S. Dist. LEXIS 160966, at *37 (noting that court "will not cull through [a] brief looking for facts and specific offers of proof to carry [d]efendant's burden to make the initial *Franks* showing"); *United States v. Ward*, No. 4:15-CR-00020, 2016 U.S. Dist. LEXIS 91625, at *28 (N.D. Ga. Jun. 24, 2016) (denying request for *Franks* hearing where defendant "fail[ed] to assert that . . . omissions were made intentionally, or with a reckless disregard for the truth").

The one piece of evidence that Kirton has provided—CI1's probation revocation that Kirton contends should have been mentioned in paragraph 14 of the affidavit (Doc. 34-2)—does not advance his cause. Kirton does not allege with any specificity, nor does he provide evidence, that the affiant intentionally or recklessly omitted this information. (*See* Doc. 34 at 5.) That alone is enough to dismiss this allegation. But if the Court proceeds with additional analysis of the affidavit, paragraph 14 lists "convictions," (Doc. 34-1 ¶ 14), not all

sentences and arrests as Kirton seems to suggest in his motion, so not listing a probation revocation arising from a prior conviction is not actually an omission. But even assuming it was an omission, nothing in paragraph 14 suggests that the affiant intentionally or recklessly omitted the probation revocation. The affiant listed five convictions, descriptions of the charges, and the punishments, dating back to 1997. (*Id*.) That paragraph included convictions for forgery and giving a false name to law enforcement. (*Id*.) Paragraph 14 shows the opposite of what Kirton contends: the affiant was seeking to thoroughly describe CI1's criminal history, not hide it. The other paragraphs describing CI1 bolster this conclusion. The affiant explained that CI1 was a target in an ongoing federal investigation concerning "identity theft, bank fraud, and other related financial fraud offenses" (*id.* ¶ 12); that CI1 hoped to "obtain[] a better result in his/her criminal case" by working with law enforcement (*id.* ¶ 13); and that CI1 had "no expertise or special training in the operation of computer systems" (*id.* ¶ 15). This fulsome description of CI1 was not reckless. Nor can any intent to mislead be ascribed to it.

Kirton has not made the substantial preliminary showing needed to entitle him to a *Franks* hearing. As such, this Court should deny the request for a *Franks* hearing with no further analysis.

### 3.3. Even if Kirton's unsupported allegations were taken as true, he is not entitled to a *Franks* hearing because his challenges to the affidavit do not alter the probable cause finding.

Even if Kirton's challenges to paragraphs 5, 14, 17, 19 through 30, 32, 34 through 39, 43, 45(d), 50, and 52 were supported by evidence, he is still not entitled to a *Franks* hearing because probable cause exists even without these paragraphs. *See Johnson*, 768 F. App'x at 925. Paragraphs 12, 13, and 15 provided background on CI1 and explained that he is the subject of a federal investigation, that he wished to cooperate, and that his descriptions of computer technology were not expert descriptions. (Doc. 34-1 ¶¶ 12–13, 15.) Paragraph 16 provided CI1's description of Kirton's scheme. (*Id.* ¶ 16.) Paragraphs 18 and 31 noted that CI1 proffered with law enforcement on October 29 and 31, 2013. (*Id.* ¶¶ 18, 31.) Paragraphs 42 through 45, excluding paragraphs 43 and 45(d), explain what happened during the November 25, 2013 undercover operation and what CI1 learned during the operation:

- "CI1 and Kirton discussed details of Kirton's fraudulent tax return scheme," including the "Tax Fraud Program." (*Id.* ¶ 44.)

- "Kirton stated that he had used a list of stolen inmate identities provided to him by CI1 to file fraudulent tax returns, but was unsuccessful in acquiring the refunds because the IRS caught the fraudulent tax returns." (*Id.*)

- CI1 explained that "Kirton said he had 3,000 accounts ready to receive funds from false tax claims he was going to file and that he already filed 700 fraudulent tax returns for the 3,000 accounts." (*Id.* ¶ 45(b).)

- CI1 explained that "Kirton still has the Tax Fraud Program on a server and still has access to the program from his cell phone." (*Id.* ¶ 45(c).)

- CI1 explained that "Kirton stated that in addition to filing false tax returns electronically using the Tax Fraud Program, he was also planning to mail in 400 paper tax returns in the coming month, 'just for fun.'" (*Id.* ¶ 45(e).)

- CI1 explained that Kirton would be visiting ATMs to "withdraw cash from the false claim return funds loaded on the pre-paid charge cards he already has in his possession." (*Id.* ¶ 45(f).)

Paragraphs 46 through 49 were also loaded with incriminating facts about Kirton, all gleaned from the second undercover operation conducted at Kirton's residence on December 9, 2013. During the meeting:

- CI1 and Kirton discussed "the status of fake driver's licenses [CI1] had previously ordered from Kirton." (*Id.* ¶ 47(a).)

- "Kirton said that his computer had two phone accounts, one for legitimate calls and the other for bootleg calls, so as to remain anonymous for communications pertaining to his fraudulent tax scheme." (*Id.* ¶ 47(b).)

- "Kirton discussed methods for filing fraudulent tax returns thru TurboTax and ProSeries." (*Id.* ¶ 47(c).)

- "Kirton discussed a fix implemented by the IRS that restricts tax fraudsters from receiving multiple refunds in the same bank account." (*Id.* ¶ 47(d).)

- Kirton explained how he goes to multiple ATMs to withdraw cash from pre-paid charge cards loaded with IRS refunds from his fraudulent tax return scheme. (*Id.* ¶ 47(e).)

· Kirton described the Tax Fraud Program to CI1 while showing him the program on a computer (*Id.* ¶ 47(f).)

· Kirton showed that he can monitor the people he employed to use the Tax Fraud Program to submit fraudulent tax returns. (*Id.* ¶ 47(g).)

· Kirton discussed his database of bank accounts that he used to receive fraudulent IRS tax refunds, and noted that some of the bank accounts were provided to him by CI1. (*Id.* ¶ 47(h).)

· Kirton described how each bank account could receive between two and five refunds per week so as to remain undetected by the IRS. (*Id.*)

· Kirton discussed a specific username for the Tax Fraud Program belonging to an individual he employed to file fraudulent tax returns. (*Id.* ¶ 47(i).)

· Kirton said that he would configure the Tax Fraud Program to allow CI1 to login to the program. (*Id.* ¶ 47(j).)

· Kirton said that he needed more bank accounts to receive fraudulently obtained refunds. (*Id.* ¶ 47(k).)

After the meeting with Kirton, CI1 met with law enforcement and explained that the website Kirton used to operate the Tax Fraud Program was www.burstlock.com (*id.* ¶ 49(a); *see id.* ¶ 48), that he observed Kirton navigate to the website (*id.* ¶ 49(b)), and that in the Tax Fraud Program he saw "pending tax refunds, bank accounts used, user activities for [Kirton's] employees, etc." (*Id.* ¶ 49(d).) CI1 also explained that Kirton was to "load up the Microsoft Surface Pro 2 tablet with what CI1 needs so that he can access www.burstlock.com and add fraudulent bank accounts and stolen identities directly into the Tax

Fraud Program so that they may be used to file returns and receive the refunds." (*Id.* ¶ 49(k).)

On January 15, 2014, CI1 and Kirton met again at Kirton's residence. (*Id.* ¶ 51.) Kirton "generated a login for CI1 to use in the Tax Fraud Program" and returned the Microsoft Surface Pro 2 to CI1. (*Id.*) Kirton also logged into the Tax Fraud Program using the Microsoft Surface Pro 2. (*Id.*) After the operation, CI1 met with the affiant and other law enforcement officers, and in their presence, "CI1 logged into the Tax Fraud Program on a . . . desktop computer using the login information Kirton generated for him." (*Id.* ¶ 52.) The affiant observed a login screen and, after the login, the affiant saw multiple tabs with labels like "phone mgmt," "videos," "training videos," "bank accounts," and "aggregators." (*Id.*)

This information amply demonstrates probable cause to search Kirton's residence. *Cf. Roundtree*, 299 F. App'x at 907; *Akel*, 337 F. App'x at 857. Probable cause is evaluated based on the totality of the circumstances. *Brundidge*, 170 F.3d at 1352. And Kirton's piecemeal rebuttals to the affidavit are immaterial when viewing the totality of information in the affidavit obtained through the proffers and undercover operations.

The purported omissions Kirton offers for paragraphs 14 and 17 do not change this conclusion. As explained in footnote 2, paragraph 14 already lists out CI1's five convictions. An additional reference to a

probation revocation would not be material and thus would not change the Magistrate Judge's assessment of CI1's veracity. *See Reid*, 69 F.3d at 1114; *Tate*, 524 F.3d at 455. And, on top of that, CI1's undercover work independently corroborated his statements, rendering reliance on CI1's veracity far less important. On paragraph 17, even if Kirton had no criminal history as he claims, that does not negate the substantial evidence supporting probable cause presented in the affidavit. To hold otherwise would have the undesired and illogical result of immunizing any defendant who had no criminal history from a search warrant. Moreover, the affiant was not required to put everything he knows in the affidavit, *Tech. Ordnance, Inc.*, 244 F.3d at 649, even if a defendant believes it is exculpatory, *see, e.g., Mays*, 134 F.3d at 816.

For these reasons, probable cause is present even when adjusting the affidavit to reflect Kirton's challenges and Kirton is not entitled to a *Franks* hearing.

## Conclusion

For the reasons stated in this opposition, Kirton's motion to suppress should be denied without a *Franks* hearing.

Respectfully submitted,

B<small>YUNG</small> J. P<small>AK</small>
*United States Attorney*

/s/ S<small>AMIR</small> K<small>AUSHAL</small>
*Assistant United States Attorney*
Georgia Bar No. 935285
Samir.Kaushal@usdoj.gov

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

Jay Shreenath

*Attorney for Defendant Kevin L. Kirton*

August 29, 2019

/s/ SAMIR KAUSHAL

SAMIR KAUSHAL

*Assistant United States Attorney*