THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

KEVIN L. KIRTON,

Defendant.

CRIMINAL CASE NO.

1:19-CR-00022-WMR-JFK

## ORDER AND REPORT AND RECOMMENDATION

Pending before the court are Defendant Kevin Kirton's motion [Doc. 30][1] and supplemental motions [Docs. 34 and 37] to suppress evidence obtained as the result of the execution of a federal search warrant [Doc. 34-1 ("Affidavit")] for his residence located at 4735 Kent Road, College Park, Georgia.  Defendant contends that the affidavit for the search warrant lacks probable cause and that he is entitled to a Franks hearing.[2]  [Docs. 34 and 37].  The Government opposes the motions to suppress. [Doc. 38].  Defendant also filed a motion [Doc. 32] to suppress statements; however, counsel for Defendant advised the court that the motion may be withdrawn.  And

---

[1]This document incorrectly appears on the docket as a motion to suppress statements.

[2]See Franks v. Delaware, 98 S. Ct. 2674 (1978).

pending before the court is Defendant's motion [Doc. 29] for a bill of particulars. Counsel for the Government advises that, after meeting with counsel for Defendant, the parties resolved the bill of particulars.

## I.      Motion to Suppress Evidence

Pending before the court are Defendant's motions to suppress evidence. [Docs. 30, 34 and 37].  In support of the motions to suppress the federal search warrant for his residence, Defendant contends that he is entitled to a <u>Franks</u> hearing because the affiant for the search warrant deliberately or with reckless disregard for the truth included misleading information in the affidavit and omitted material information from the affidavit and that, when the affidavit is corrected, probable cause is lacking for the warrant. [Docs. 34 and 37].  The Government opposes the motions to suppress contending that Defendant has not made a sufficient showing to entitle him to a <u>Franks</u> hearing and that the affidavit otherwise provides probable cause for the search of his residence.  [Doc. 38].  After consideration of the arguments of the parties, the affidavit for the search warrant and the persuasive legal authority, the court recommends that Defendant's motions to suppress be denied.

### a.      Search Warrant & Affidavit

On January 21, 2014, Special Agent Alexandre Herrera, United States Secret Service ("USSS"), presented to U.S. Magistrate Judge Gerrilyn Brill an application and affidavit for a search warrant for 4735 Kent Road, College Park, Georgia ("Target Location"), to search for evidence of violations of 18 U.S.C. §§ 287 (false claims), 371 (conspiracy), 1028 (fraud in connection with identification documents) and 1344 (bank fraud). (Affidavit ¶¶ 5-6). Agent Herrera ("Affiant") began the affidavit by outlining his training and experience as a law enforcement officer, including, specializing in the investigation of financial crimes, of bank fraud, of identity theft and other offenses. After college graduation, he attended federal law enforcement training addressing investigative techniques and use of computers and the internet to commit criminal activities. (Id. ¶ 2). Additionally, Affiant has on-the-job experience investigating crimes involving tax, wire, mail and bank fraud, identity theft, money laundering and access device fraud and has conducted these investigations using a variety of investigative means. (Id. ¶ 3). In support of probable cause to search the Target Location, Affiant provided the following information.

Affiant stated that, in late 2011, a confidential informant ("CI1") became the target of an USSS investigation for identity theft, bank fraud and other related offenses and that, in October 2013, CI1 began cooperating by providing information

3

about three active investigations of fraud schemes with the hope of obtaining a better result in his case.  CI1's cooperation included surveillance operations against three individuals.  (Id. ¶¶ 12-13).  Affiant set forth CI1's criminal history which included a 1997 conviction for theft by receiving stolen property, 1998 convictions for theft by receiving stolen property, for reckless conduct, for possession of a firearm by a convicted felon and carrying a concealed weapon, and second degree forgery, a 2002 conviction for driving under the influence, 2002 convictions for giving a false name to law enforcement officers and wilful obstruction of law enforcement officers and a 2004 conviction for violation of the Georgia RICO statute for which he received a sentence of eighteen years and was released on parole in May 2009.  (Id. ¶ 14).  Affiant also noted that to the extent the information provided is based on the CI1's descriptions of computer systems, he has no training or experience in the operation of computer systems.  (Id. ¶ 15).

With respect to Defendant Kirton, Affiant related that CI1 advised that Defendant conducted, among other schemes, a fraudulent tax return scheme, which, as corroborated by USSS surveillance operations, involved a computer application created and maintained by Defendant to file fraudulent tax returns using stolen identities.  The tax refunds were deposited into fraudulent bank accounts, some being

provided to Defendant by CI1, and into pre-paid debit cards.  (Id. ¶ 16).  In October 2013, a USSS criminal research specialist, based on database searches for Defendant - including a criminal history report, found that Defendant's address is 4735 Kent Road, College Park, Georgia.  (Id. ¶ 17).

On October 29, 2013, CI1 proffered as follows.  CI1 advised that he has known Defendant since at least 2009 and that Defendant "had the most sophisticated tax fraud system he knew and . . . was a computer technology guru."  (Id. ¶¶ 18-19).  Affiant related that "CI1 described [Defendant] as a black male, between 34 and 36 years old, 5 [foot]-10 [inches], 205 lbs., and single" and that his friendship with Defendant "includes nightlife activities in the Atlanta area."  (Id.).  CI1 stated that from 2009 until September 2013, Defendant created and maintained web sites for CI1 to use in various fraudulent schemes involving establishing fake auto dealerships to obtain fraudulent auto loans using stolen identities, in which the CI1 obtained over $280,000 in fraudulent auto loans, and to obtain personal identifying information for use in fraud schemes.  (Id. ¶¶ 20-21).  Defendant also assisted CI1 by setting up a static IP address required by LexisNexis which CI1 used to illicitly obtain identities.  (Id. ¶ 22).

With respect to Defendant's tax fraud scheme, CI1 advised that Defendant created a tax fraud program which sends fraudulent returns using stolen identifies to

the IRS and tracks the returns, automatically sets up and activates pre-paid cards for use to receive fraudulent tax refunds, stores stolen identities and uses them to automatically populate tax returns, and permits users to remotely log in via the Internet to allow use of the program to generate fraudulent tax returns.  (Id. ¶ 23). Defendant provides the login information for the program to allow others to generate fraudulent returns and tracks those returns in order to compensate each user for submitting returns.  Defendant also created a tutorial for the program and posted it on his server to reduce the time he spends assisting other users.  (Id. ¶¶ 24-25). Defendant supplies users with programed modems to "create ghost IP addresses" and that allows for IP addresses to be changed to prevent the IRS from tracking a fraudulent tax return by IP address.  (Id. ¶ 26).  CI1 advised that Defendant can access the tax fraud program on his cell phone and that he has observed information related to fraudulent returns on Defendant's cell phone.  (Id. ¶ 27).  CI1 advised that Defendant told him, CI1, that Defendant "has filed fraudulent tax returns totaling between $500K and $700K in a single week."  (Id. ¶ 28).

CI1 advised that Defendant uses Walmart pre-paid cards to receive fraudulent tax refunds and he, CI1, has seen trash bags full of the cards in Defendant's residence. Defendant has the pre-paid money cards mailed to various addresses, including

Columbus, Georgia, and Montana, has the cards "placed on hold" until loaded, and then has the cards mailed to Atlanta.  Defendant obtains the cards and withdraws the funds from ATM machines.  (Id. ¶ 29).  CI1 also advised that he has seen computer towers in an upstairs bedroom of Defendant's residence and a computer in a back upstairs bedroom.  (Id. ¶ 30).

CI1, on October 31, 2013, provided the following additional information.  He advised that he sold Defendant a black 2013 Mercedes Benz E350.  (Id. ¶ 31).  He advised that Defendant lives alone in a "split-level" residence, with a carport with rooms located above, located off of Roosevelt Highway and Washington Road in South Atlanta.  (Id. ¶ 33).  Individuals, working from various town homes, assist Defendant by inputting stolen identifies, supplied by others, in the tax fraud program. (Id. ¶ 34).  CI1 advised that Defendant uses the domain "punkmail.net" and that he, CI1, has used the email to communicate with Defendant to further their fraudulent schemes.  (Id. ¶ 35).  Defendant created a system to allow a pre-paid card loaded with a fraudulent tax refund to appear to have been used at various merchant service accounts to provide the appearance of legitimacy.  (Id. ¶ 36).  CI1 also stated that Defendant advised "that all successful fraudulent returns . . . filed from the previous year are filed again in January" and, as an example, advised CI1 that he successfully

filed 700 fraudulent tax returns in one week last year using data from returns filed the prior year. (Id. ¶ 37). CI1 advised that, at the Cheetah Night Club, Defendant showed him a tax fraud application on Defendant's cell phone, a smartphone running the Android operating system, and showed him Defendant's earnings from some of the returns. (Id. ¶ 38). And about two years ago, Defendant showed CI1 the tax fraud program tutorial. (Id. ¶ 39). CI1 advised that Defendant's main computer system is in an upstairs study at Defendant's residence. (Id. ¶ 40). CI1 also immediately and correctly identified Defendant from a photo array and drew a detailed sketch of the floor plan of Defendant's residence. (Id. ¶¶ 41-42).

On November 25, 2013, CI1 met with USSS agents for a surveillance operation and agreed to wear covert audio and video recording equipment during a meeting with Defendant at the Target Location. During the meeting, CI1 asked Defendant to create three fake driver's licenses for CI1. CI1 provided Defendant with three small, headshot photographs for Defendant to use for the driver's licenses. CI1 asked Defendant to have the driver's licenses, two from Florida and one from Tennessee, reflect the age of the persons between thirty and thirty-five years old. Defendant discussed the price charged by a coconspirator who assists in preparing fake driver's licenses. (Id. ¶ 43). CI1 and Defendant discussed details of the fraudulent tax return

AO 72A
(Rev.8/82)

scheme and the tax fraud program.  Defendant stated that he used a list of stolen inmate identities provided by CI1 to file fraudulent returns but was not successful because the IRS caught the returns.  (Id. ¶ 44).  CI1 provided details to USSS agents learned from the meeting immediately after the meeting ended, including, that the server for the tax fraud program is called XL Host and costs $450.00 per month, that Defendant said he has 3,000 accounts (which CI1 understood to be pre-paid cards) ready to receive funds from false tax returns and that he had already filed 700 false returns, that the program is still on Defendant's server which Defendant can access from his cell phone, that Defendant said he "filed $300K in fraudulent tax return claims last week in a single batch[,]" that Defendant said he was also planning to mail paper returns in the coming month, and that Defendant said, the next day, he was going to various ATM's to withdraw cash from the pre-paid cards.  (Id. ¶ 45).

On December 9, 2013, CI1 met with USSS agents prior to another recorded meeting with Defendant at the Target Location.  CI1 wore audio and video recording equipment.  Defendant exited the Target Location and met CI1 on the driveway and in the carport.  CI1 provided Defendant with a Microsoft Surface Pro 2 (which had been purchased by USSS) for Defendant to load to provide CI1 with access to the tax fraud program.  (Id. ¶ 46).  Affiant recounted that during the meeting, the following

9

was discussed.  CI1 asked about the status of the fake drivers licenses, and Defendant replied that his coconspirator was ready to make them but that he, Defendant, had forgotten to drop off the photographs.  Defendant described "a 'bootleg' phone system that he set up on his computer" and advised that his computer had two phone accounts, one for legitimate calls and the other for "bootleg calls" in order to maintain anonymous communications for his tax fraud scheme.  Defendant discussed methods for filing fraudulent tax fraud returns using Turbo Tax and ProSeries.   (Id.). Defendant also discussed a "fix implemented by the IRS" restricting the receipt of multiple refunds into the same bank account.  He described to CI1 going to multiple ATM's to withdraw cash from the pre-paid cards loaded with fraudulent refunds.  He also described the tax fraud program to CI1 using his, Defendant's, laptop computer and showed how the program monitors user activities, specifically of individuals using the program to file fraudulent tax returns.  Defendant also discussed his database of bank accounts, some provided by CI1, being used to receive fraudulent refunds and that each account could receive two to five refunds a week to avoid detection by the IRS.  Defendant also discussed one user, Ice Urban, employed by Defendant to "push" fraudulent returns.  (Id.).  Defendant advised that he would configure the tax fraud program to allow CI1 to physically login and add bank accounts to receive fraudulent

10

refunds.  Defendant stated that he needed more bank accounts to receive refunds. Defendant stated he had fraudulent refunds received or pending in the amount of $21K and $25K and that he had an IRS tax insider feeding him, Defendant, information to be able to file fraudulent returns undetected.  (Id.).

Affiant stated that, at the conclusion of the meeting, CI1 called and advised that the web site www.burstlock.com was the interface used by Defendant on his laptop to connect to the tax fraud program.  (Id. ¶ 48).  When CI1 met with agents, he repeated that information and also advised the following.  During the meeting, Defendant entered his residence to retrieve a silver Dell mini-laptop, which was the laptop Defendant used to create the tax fraud program, and used the laptop to connect via the web site to the tax fraud program and to explain the program to CI1.  The first screen on the web site was a login box for a username and password.  (Id. ¶ 49).  CI1 advised that, in the program, he saw tabs for pending tax refunds highlighted in green (approximately 200 were pending), for bank accounts and for user activities by employees.  (Id.).  CI1 relayed that Defendant discussed obtaining 70,000 stolen identities for use in the tax fraud scheme from a coconspirator, who obtained the identities from a computer hacker, but that only about 10,000 of the identities were good to use.  (Id.).  CI1 advised that last year he gave Defendant ten bank accounts,

11

set up with stolen identities and fictitious business names, to use to receive fraudulent refunds and that another person gave Defendant up to 200 such bank accounts. (Id.). Defendant described for CI1 how he, Defendant, had been withdrawing cash from multiple ATM's using cards loaded with fraudulent tax refunds. (Id.). CI1 also described the motorcycle, a Suzuki GS-XR 750 series, parked in Defendant's carport. (Id.). And CI1 said that Defendant was to load the Microsoft Surface Pro 2 tablet with what is needed for CI1 to access www.burstlock.com and to be able to load fraudulent bank accounts and stolen identities in the tax fraud program for filing returns and receiving refunds. (Id.).

On December 16, 2013, CI1 made a recorded call to Defendant during which they discussed preparing the Microsoft Surface Pro 2 previously provided by CI1. Affiant states, according to CI1, that the computer was to be used in the tax fraud scheme. Also, according to CI1, Defendant advised that the fake driver's licenses were ready, that he needed to pick them up and that he would have them by Wednesday. (Id. ¶ 50).

On January 15, 2014, CI1, wearing recording equipment, met with Defendant at the Target Location. (Id. ¶ 51). Affiant stated that, during the meeting, Defendant generated a login for CI1 to use which would allow CI1 to input personal identifying

12

and bank account information in the tax fraud program.  Defendant provided the computer to CI1 and accessed the program on the computer.  (Id.).  After the meeting, CI1 met with USSS agents and, in their presence, accessed that tax fraud program on the computer via the web site www.burstlock.com.  (Id. ¶ 52).  Affiant witnessed CI1 login and observed a screen with multiple tabs, including "phone mgmt," videos," training videos," "bank accounts," and "aggregators."  (Id.).

Affiant then provided an overview of technical terms regarding the internet and electronic devices and the parameters for the search of such devices, including data storage, search engines and related information.  (Id. ¶¶ 53-58).  Attachment A to the affidavit described the place, Target Location, to be searched, and Attachment B provided itemization of the property to be seized.  (Affidavit, Attachments A and B).

Additional facts will be set forth as necessary during discussion of the motions to suppress.

### b.   **Franks and Probable Cause**

Defendant first contends that due to the inclusion of materially false information in and the omission of material information from the affidavit for the search warrant, he is entitled to a Franks hearing.  [Docs. 34 and 37].  Defendant contends that Affiant omitted the following material facts from the affidavit:  (1) ¶ 14, CI1's criminal

history, omitting information that CI1's probation was revoked for committing new criminal offenses in 2002, citing to the attached Consent Revocation Order, which Defendant alleges was readily available to Affiant [Doc. 34 at 5; Doc. 34-2 ("Consent Revocation Order")];[3] (2) ¶ 17, database search for Defendant, including criminal history, omitting information that Defendant did not have any criminal history, no citation to supporting evidence [Doc. 34 at 5-6]; (3) ¶ 19, CI1's relationship with Defendant, omitting information that, although CI1 said he had known Defendant since 2009 and that Defendant was single, Affiant should have been aware that CI1 had known Defendant for a longer period of time and that Defendant was married with a child, citing no supporting evidence [Id. at 7-8]; and (4) ¶ 43, recorded conversation on November 25, 2013, regarding fake driver's licenses, omitting Defendant's initial question why CI1 was giving him, Defendant, the photographs, citing to the recording of the meeting, however, without providing a copy of that recording or a transcript [Id. at 43-44].   Defendant also alleges that Affiant included in the affidavit material misrepresentations:   (1) ¶ 32, statement that CI1 sold Defendant a black 2013 Mercedes E350, which, if Affiant had reviewed automobile sales documents, said

---

[3]Defendant did not provide pagination for his brief.  The court's citation to page numbering for Defendant's briefs are the CM/ECF pagination.

14

documents would show Defendant bought a silver Mercedes 350 from a dealership, providing no citation to supporting evidence [Id. at 9-10]; (2) ¶ 45d., Defendant's November 25, 2013, statement to CI1 that he, Defendant, filed $300K in fraudulent tax returns last week, which Affiant knew had to be false because November is too early to file returns, providing no citation to supporting evidence [Id. at 11-12]; and (3) ¶ 50, recorded conversation on December 16, 2013, regarding preparing the Microsoft Pro 2 computer and the status of the fake driver's licenses, topics Defendant contends were not discussed in the recording of the conversation, based on Defendant's summary and partial transcription [Doc. 37].[4]   With respect to Defendant's request for a Franks hearing, the Government responds as follows:  (1) that, with the exception of the probation revocation document, Defendant provides no offer of proof as required either establishing that the statements were incorrect or that

---

[4]Defendant's remaining challenges to paragraphs in the Affidavit do not fall under Franks but are, instead, arguments going to whether probable cause was established, particularly contending that Affiant did not establish CI1's reliability in order for the Magistrate Judge to evaluate credibility and to rely on the information CI1 provided.  [Doc. 34 at 7-8 (Affidavit ¶ 19, lack of basis provided for CI1's knowledge); at 8-9 (Affidavit ¶¶ 19-30, lack of basis for CI1's knowledge and providing only general and conclusory statements); at 10 (Affidavit ¶¶ 34-39, arguing Affiant could have conducted investigation to verify CI1's statements); and at 13 (Affidavit ¶ 52, contending that the information is not incriminatory)].  These arguments will be addressed after resolving whether Defendant is entitled to a Franks hearing.

omissions were made or that Affiant knew or should have known he included material false statements or omitted material information [Doc. 38 at 17-21] and (2) that, even if the challenged paragraphs were not considered or the omitted information added, the remaining paragraphs establish probable cause [Id. at 22-26].[5]

In Franks, 98 S. Ct. 2674, the Supreme Court held that where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by an affiant in a search warrant affidavit, and if the allegedly false statement was necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request to determine admissibility of the fruits of the search. Franks, 98 S. Ct. at 2684-85; see also United States v. Sarras, 575 F.3d 1191, 1218 (11th Cir. 2009). "[T]o prevail in a Franks challenge one must establish (1) that information contained in an affidavit was untrue, (2) that inclusion of the untrue information was either deliberate or in 'reckless disregard for the truth,' and (3) that the untrue information was an

---

[5]The Government includes in the listing of paragraphs [Doc. 38 at 22] to be omitted during the probable cause evaluation a number of paragraphs which the court, supra, identified as not properly presenting a Franks challenge to the affidavit but as actually an attack on probable cause. Accordingly, the court's consideration of Defendant's request for a Franks' hearing will focus solely on the challenged paragraphs arguably falling under Franks.

16

essential element of the probable cause showing relied upon by the judicial officer in issuing the search warrant." O'Ferrell v. United States, 253 F.3d 1257, 1267 (11ᵗʰ Cir. 2001) (citation omitted).

And Franks is applicable to information omitted from an affidavit for a search warrant.  "[A] warrant affidavit violates the Fourth Amendment when it contains omissions 'made intentionally or with a reckless disregard for the accuracy of the affidavit.'" Madiwale v. Savaiko, 117 F.3d 1321, 1326-27 (11ᵗʰ Cir. 1997) (citation omitted).  "A party need not show by direct evidence that the affiant makes an omission recklessly.  Rather, it 'is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself.'" Id. at 1327 (citation omitted); accord United States v. Owden, 345 Fed. Appx. 448, 454 (11ᵗʰ Cir. 2009) (same).  "Omissions that are not reckless, but are instead negligent . . . or insignificant and immaterial, will not invalidate a warrant. . . .   Indeed, even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause." Madiwale, 117 F.3d at 1327; accord United States v. Kapordelis, 569 F.3d 1291, 1309 (11ᵗʰ Cir. 2009) ("The defendant bears the burden of showing that, 'absent those misrepresentations or omissions, probable cause would

17

have been lacking.'") (citation omitted).  No <u>Franks</u> hearing is required, if, when the

omitted information is added to the affidavit, the affidavit's content still establishes

probable cause for the search.  <u>Kapordelis</u>, 569 F.3d at 1309; <u>Owden</u>, 345 Fed. Appx.

at 454 (if the challenge is based on information omitted from the affidavit, then the

showing must be that the "'omission was essential to the finding of probable cause'")

(quoting <u>United States v. Arbolaez</u>, 450 F.3d 1283, 1294 (11th Cir. 2006)).

Accordingly, to mandate a <u>Franks</u> evidentiary hearing,

the [defendant's] attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.   Allegations of negligence or innocent mistake are insufficient.   The deliberate falsity or reckless disregard whose impeachment is permitted . . . is only that of the affiant, not of any nongovernmental informant.  Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.  On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing.  Whether he will prevail at that hearing is, of course, another issue.

18

Franks, 98 S. Ct. at 2684-85; see also Arbolaez, 450 F.3d at 1294 (same).  The court, when applying this standard to Defendant's request for a Franks hearing, finds that Defendant has not made a substantial preliminary showing that material misrepresentations were intentionally and/or recklessly included in the affidavit or that material information was intentionally and/or recklessly omitted from the affidavit or, alternatively, made a showing that such alleged misrepresentations or omissions undermined the probable cause otherwise set forth in the affidavit as necessary for a Franks hearing to be held.  The court notes at the outset of this discussion that the most glaring shortcoming in Defendant's arguments is the lack of support to find that omissions were made or false information included and, if so, proof of the requisite intent.  See Arbolaez, 450 F.3d at 1294 ("There is no affidavit or otherwise sworn statement alleging that [affiant] knowingly or recklessly included false statements in the search warrant affidavit.  Accordingly, we find that Arbolaez has failed to make the necessary 'substantial preliminary showing' and that there is no error."); United States v. Angulo-Hurtado, 165 F. Supp. 2d 1363, 1375 (N.D. Ga. 2001) (no Franks hearing when the defendants failed to offer proof that the affiant had some basis for knowing statement was false).

19

The court will first address the allegedly material information Defendant contends Affiant intentionally or recklessly omitted from the Affidavit in ¶¶ 14, 17, 19 and 43.  Defendant contends that, by omitting information that CI1's probation was revoked for committing new criminal offenses in 2002 in ¶ 14, Affiant knowingly failed to include information impacting the Magistrate Judge's evaluation of CI1's credibility and undermining the probable cause determination.  Defendant alleges that this information was readily available to Affiant.  [Doc. 34 at 5; Doc. 34-2 ("Consent Revocation Order")].  Although Defendant offers no proof that Affiant was aware of CI1's probation revocation in 2002, inclusion of that information would have had no impact on the Magistrate Judge's credibility determination.  In the same paragraph, Affiant outlined CI1's criminal history, including a 1997 conviction for theft by receiving stolen property, 1998 convictions for theft by receiving stolen property, for reckless conduct, for possession of a firearm by a convicted felon and carrying a concealed weapon, and second degree forgery, a 2002 conviction for driving under the influence, 2002 convictions for giving a false name to law enforcement officers and wilful obstruction of law enforcement officers and a 2004 conviction for violation of the Georgia RICO statute for which he received a sentence of eighteen years and was released on parole in May 2009.  (Affidavit ¶ 14).  Additionally, in the affidavit,

20

Affiant outlined CI1's admission of engaging in criminal conduct after 2009 and that, in the hope of receiving consideration in a current criminal case, CI1 was cooperating with USSS agents in multiple investigations. (Id. ¶¶ 13, 20-21, 23, 43, 47). A reading of the affidavit indicates that Affiant was not trying to hide, intentionally or otherwise, information that would negatively impact CI1's credibility. However, the court will include the fact of the probation revocation when considering probable cause for the search.

Defendant next contends that Affiant intentionally omitted information from the database search for Defendant referenced in ¶ 17 which, if included, would have shown that Defendant did not have any criminal history. Defendant provides no citation to supporting evidence, that is, that Defendant does not have any criminal history or supporting a conclusion that, knowing such information, Affiant made a decision to omit it from the Affidavit. [Doc. 34 at 5-6]. Defendant's argument as to why this information would have been material to the probable cause determination is that the Magistrate Judge "could have reasonably" inferred that Defendant had a criminal history. [Id. at 6]. Defendant also argues that, if the Magistrate Judge knew Defendant did not have a criminal history as compared to CI1's extensive criminal history, the Magistrate Judge would have further doubted CI1's credibility. [Id. at 6-

21

7].  Defendant's speculation as to what the reviewing Magistrate Judge might have thought and as to how the Magistrate Judge might have viewed the credibility of CI1 if aware of Defendant's lack of criminal history is speculative and not persuasive.  The Magistrate Judge was well aware of CI1's propensity to engage in criminal conduct, that he was cooperating for self-benefit and that his credibility was subject to question. Defendant's lack of criminal history would not have been a material factor in that equation.  However, for the purpose of evaluating probable cause, the court will include - although no evidence supports Defendant's unsubstantiated statement - in ¶ 17 that Defendant did not have a criminal history.

Defendant also contends that Affiant omitted information that, although in the affidavit Affiant recounted that CI1 said he had known Defendant since 2009 and that Defendant was single (Affidavit ¶ 19), Affiant should have been aware that CI1 had known Defendant for a longer period of time and that Defendant was married with a child.  [Doc. 34 at 7-8].  Defendant alleges that, based on the Affiant's investigation and other investigator's reports - not provided or even identified, Affiant should have been aware that CI1 knew Defendant prior to 2009.  This information is material, as Defendant argued regarding Defendant's lack of criminal history, because Defendant was never previously implicated in CI1's illegal conduct, for which CI1 was

22

convicted.  [Id. at 7].  Defendant also alleges that Affiant should have known that Defendant was married with a child based on his, Affiant's, familarity with Defendant and from a review of the public records - again there is no evidentiary support for Defendant's claims or, even if supported, for a finding that including in the affidavit that CI1's statements were incorrect would undermine the informant's credibility.  [Id. at 8].  The court notes that the Affiant recounted that CI1 stated that he had known Defendant since at least 2009 [Affidavit ¶ 19] and not that he met Defendant that year or did not know Defendant prior to 2009.  With respect to CI1's statement that Defendant was single, besides Defendant's failure to establish that Affiant knew or should have known otherwise, Defendant does not even contend that CI1 was aware - or should have been aware - that Defendant was married with a child such that adding that information would undermine CI1's credibility.  See United States v. Rivera, 524 Fed. Appx. 821, 826 (3rd Cir. 2013) (rejecting the defendant's unsubstantiated contentions in seeking Franks hearing that the affiant should have questioned the veracity of the informant's information because the defendant "offered no evidence that the detective who provided the affidavit either knew that the information [from the informant] was not true or recklessly disregarded its falsity").  Quite simply, Defendant's counsel's contentions set forth *supra* do not constitute "proof" either that

23

the affidavit omitted material information or that Affiant knowingly or otherwise omitted material information.  See United States v. Flowers, 531 Fed. Appx. 975, 981 (11ᵗʰ Cir. 2013) ("Franks requires the defendant to offer proof that the affiant had the requisite intent[;]" noting that Franks offered as examples of supporting proof, including, "'affidavits or sworn or otherwise reliable statements of witnesses,' apart from the warrant affidavit") (quoting Franks, 98 S. Ct. at 2684); United States v. Mealor, 2018 WL 7283635, at *4 (N.D. Ga. October 9, 2018) ("These wholly conclusory assertions [by defense counsel], devoid of any factual proffer to support them, are insufficient to demonstrate th[at] probable cause was lacking or that Defendant is entitled to a hearing under Franks."), report and recommendation adopted by, 2019 WL 181387 (N.D. Ga. January 14, 2019); United States v. Underwood, 2011 WL 2036498, at *1 (M.D. Fla. May 24, 2011) (the allegations by the defendant's counsel in the brief in support of the motion to suppress, "without more, cannot be considered by the Court in making up for [the] deficiency" in providing no offer of proof).  The court concludes that no information should be added to ¶ 19 based on Defendant's unsubstantiated allegations.

And Defendant contends, with respect to the recorded conversation on November 25, 2013, regarding CI1 asking Defendant to prepare fake driver's licenses

24

(Affidavit ¶ 43), that Affiant omitted Defendant's initial question why CI1 was giving him, Defendant, the photographs for the driver's licenses.  In support, Defendant cites to the recording of the meeting, however, does not provide a copy of that recording or a transcript.  [Doc. 34 at 43-44].  The court will add to this paragraph Defendant's question, apparently at the beginning of the conversation, asking why CI1 was giving the photographs to him; however, based on the totality of the recounted conversation, the court finds the question immaterial.  Whether or not, when first asked to create the driver's licenses, Defendant was surprised or not expecting to assist CI1 as Defendant contends [Doc. 34 at 11], it is evident that once CI1 explained his request for Defendant to create three fake driver's licenses for CI1, provided Defendant with three small, headshot photographs for Defendant to use for the driver's licenses and provided instructions, Defendant did not object or refuse.  Furthermore, Defendant's discussion of the price charged by a coconspirator who assists in preparing fake driver's licenses indicates that he had engaged in this conduct previously.  (Affidavit ¶ 43).

Defendant also contends that material misrepresentations were included in the affidavit knowingly or, at least, recklessly by Affiant.  First, Defendant alleges that including the statement that CI1 sold Defendant a black 2013 Mercedes E350 was a

25

material misrepresentation, which, if Affiant had reviewed automobile sales documents, he would know that Defendant bought a silver Mercedes 350 from a dealership. [Doc. 34 at 9-10]. Defendant provides no support for his claim that Defendant bought a silver Mercedes 350. He also provides no basis for the court to conclude that, even if Defendant did buy such a vehicle, Affiant reasonably should be aware of that fact, that is, should have conducted an investigation to determine if Defendant ever bought any vehicle from any number of dealerships located, presumably, anywhere. Affiant was not required to do so. Courts have uniformly rejected defense arguments that further investigation should have been conducted to either corroborate or to negate the information in the affidavit or else the search warrant lacks probable cause.[6]  See, e.g., United States v. Shields, 458 F.3d 269, 280 (3rd Cir. 2006) (rejecting the defendant's contention that affidavit lacked probable because FBI could have conducted more investigation, the court stated that "[w]hether the FBI could have provided more information is not the benchmark," the question is whether the "valid information it supplies satisfies the 'fair probability' standard");

---

[6]Defendant makes similar unpersuasive arguments, that is, attacking Affiant's alleged failure to investigate further to either substantiate or refute the information provided by CI1, in order to challenge other information in the affidavit. [Doc. 34 at 8-10].

26

United States v. Dale, 991 F.2d 819, 844 (D.C. Cir. 1993) (rejecting the defendant's argument that probable cause "require[s] an officer to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence").  And, even assuming that Defendant bought a silver Mercedes 350 from a car dealership, that fact would not result in the conclusion that CI1's statement that he sold, on an unspecified date, a black Mercedes 350 to Defendant is false.  There is no basis upon which to conclude that Affiant should have questioned CI1's statement.  See O'Ferrell v. United States, 32 F. Supp. 2d 1293, 1301 (M.D. Ala. 1998) ("Reckless disregard for the truth . . . occurs where a government agent or instrumentality harbored or should have harbored serious doubts about the truth of a statement but made the statement anyway."); accord United States v. Gonzalez, 2010 WL 2721882, at *13 (N.D. Ga. May 25, 2010) ("Additionally, [r]ecklessness may be inferred from circumstances evincing obvious reasons to doubt the veracity of the allegations.") (citations and internal quotation marks omitted).

Defendant also contends that Affiant included a material false statement, from the meeting on November 25, 2013, between Defendant and CI1, about Defendant filing $300K in fraudulent tax returns last week, which Defendant alleges Affiant had to know was false because November is too early to file tax returns.  [Doc. 34 at 11-

27

12]. Defendant provides no substantiation for his contentions. However, the bigger problem with Defendant's argument that Affiant included a material misrepresentation in the affidavit is what Defendant fails to acknowledge, that is, neither Affiant nor CI1 are asserting Defendant's statement is true. The Affiant only stated in the affidavit that, during the recorded meeting with Defendant on November 25, 2013, *Defendant made* a statement to CI1 that he, Defendant, filed $300K in fraudulent tax returns last week. (Affidavit ¶ 45d.). Whether Defendant is puffing or making a misrepresentation to CI1 is not the point. Importantly, Defendant does not argue that he *did not* make the statement to CI1 during the meeting. Defendant has not shown that Affiant's inclusion of Defendant's statement to CI1 constituted a material misrepresentation of fact.

Finally, Defendant contends that Affiant included materially false information in ¶ 50 concerning the recorded conversation on December 16, 2013, during which Affiant stated that Defendant and CI1 discussed preparing the Microsoft Pro 2 computer for CI1 to be able to use the tax fraud program and discussed the status of the fake driver's licenses. Defendant contends these topics were not discussed in the recording of the conversation, citing to his summary and partial transcription of the recording of the conversation. [Doc. 37]. In order to address Defendant's argument,

28

it is important to consider how Affiant presented the information that he related about the December 16, 2013, discussion between Defendant and CI1.  Affiant stated that, on December 16, 2013, CI1 made a recorded call to Defendant during which they discussed preparing the Microsoft Surface Pro 2 previously provided by CI1. (Affidavit ¶ 50).  The Magistrate Judge could reasonably conclude that this statement by Affiant was based on what he heard on the recording.  As to the remainder the paragraph, Affiant states, *according to CI1*, that the computer was to be used in the tax fraud scheme.  Also, *according to CI1*, Defendant advised that the fake driver's licenses were ready, that he needed to pick them up and that he would have them by Wednesday.  (Id.).  The Magistrate Judge could reasonably have understood Affiant to be saying that CI1 interpreted the conversation with Defendant in this manner.[7]  So the question is whether Defendant has presented sufficient support to determine that Affiant knew or should have known that CI1 was misrepresenting the conversation

---

[7]This is not the only time in the affidavit that Affiant includes information in the affidavit based on his, Affiant's, having reviewed the recording of conversations between Defendant and CI1 and then, based on discussions with CI1 after the meeting, continues relating in the affidavit CI1's understanding of the discussions with Defendant.  (Affidavit ¶¶ 42-49, 51).  The court notes that Affiant could have been clearer in differentiating between what he, Affiant, is recounting from listening to the recording of the conversations and what he, Affiant, is reporting based on CI1's understanding of the conversations.

29

based on the actual recording and, if so, is that information material to the probable cause determination.   Relying on Defendant's summary of the conversation, but ignoring his opinion as to what either Defendant or CI1 intended (that is, to load movies, storage for movies, etc., or that the discussions are about CI1's business - which, in any event, appears to be related to fraudulent schemes), Defendant and CI1 do discuss getting the computer ready and that Defendant knew what he was going to do with the computer but was also offering to CI1 to put "other stuff" (arguably besides the tax fraud program) on the computer "to" [sic].  [Doc. 37 at 2-3].  Affiant's acceptance of CI1's understanding that Defendant was loading the tax fraud program on the computer is supported by other discussions between them and the fact that Defendant actually did load the program on the computer.  (Affidavit ¶¶ 44-45, 47-49, 51-52).  See O'Ferrell, 32 F. Supp. 2d at 1301; Gonzalez, 2010 WL 2721882, at *13. And Defendant interprets CI1's question when everyone is going to the club and Defendant's response that "they are kind of ready" but that he "just didn't had time to link up with him" and CI1 then asking if "possibly by Wed maybe" and Defendant's answer, "Yep 100%", as being about going to a party and invitations to a party.  [Doc. 37 at 3-4].  Affiant's acceptance of CI1's interpretation that this part of the discussion concerned the fake driver's licenses, previously discussed during recorded meetings

30

with Defendant, is reasonable.  (Affidavit ¶¶ 43, 47).  <u>See</u> <u>Rivera</u>, 524 Fed. Appx. at

826).  Nonetheless, the court will omit ¶ 50 from consideration of probable cause for

the search because that paragraph is not material to the probable cause determination.

 The court will next address if, with the additions to ¶¶ 14, 17 and 43 and with

the omission of ¶ 50, the affidavit nonetheless establishes probable cause to search the

Target Location, Defendant's residence.  The affidavit, as corrected, for the search

warrant is to be evaluated based on the totality of the information set forth therein.

<u>See</u> <u>United States v. Jiminez</u>, 224 F.3d 1243, 1248 (11th Cir. 2000).  And affidavits are

not to be judged in "a hypertechnical manner; rather, a realistic and commonsense

approach should be employed . . . ." <u>United States v. Miller</u>, 24 F.3d 1357, 1361 (11th

Cir. 1994).  The issuing magistrate judge, in deciding whether to sign a search

warrant, is "'simply to make a practical, common sense decision whether, given all the

circumstances set forth in the affidavit before him, including the veracity and the basis

of knowledge of persons supplying hearsay information, there is a fair probability that

contraband or evidence of a crime will be found in a particular place.'" <u>Jiminez</u>, 224

F.3d at 1248 (quoting <u>Illinois v. Gates</u>, 103 S. Ct. 2317, 2332 (1983)) (internal

quotation marks omitted).  In this regard, "'probable cause is a fluid concept – turning

on the assessment of probabilities in particular factual contexts[.]'" <u>United States v.</u>

31

Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (quoting Gates, 103 S. Ct. at 2329);

and see United States v. Sanders, 2016 WL 6471046, at *2 (N.D. Fla. October 31,

2016) ("The issuing judge is permitted to draw reasonable inferences using common

sense . . ., mindful that probable cause is a 'fluid concept' . . . ."); United States v.

Lebowitz, 647 F. Supp. 2d 1336, 1352 (N.D. Ga. 2009) (noting that a magistrate judge

may draw reasonable inferences in determining probable cause and that "the affidavit

is given a 'common sense and realistic' interpretation") (citation omitted).  For this

reason, "[c]ourts reviewing the legitimacy of search warrants should not interpret

supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense

approach should be employed so as to encourage recourse to the warrant process and

to promote the high level of deference traditionally given to magistrates in their

probable cause determinations."  Miller, 24 F.3d at 1361 (citing Gates, 103 S. Ct. at

2331-32; United States v. Ventresca, 85 S. Ct. 741, 746 (1965)); accord United States

v. Hatcher, 300 Fed. Appx. 659, 663 (11th Cir. 2008) (same).  In reviewing the

issuance of the federal search warrant, the undersigned must determine only that

Magistrate Judge Brill had a "substantial basis" for concluding that probable cause

existed to uphold the warrant.  See Gates, 103 S. Ct. at 2331; see also Massachusetts

v. Upton, 104 S. Ct. 2085, 2085 (1984) (per curiam).  The corrected affidavit in this case satisfies that standard.

The focus of Defendant's challenge to probable cause is the credibility of CI1 and whether the affidavit provides a basis for the Magistrate Judge to evaluate the informant's reliability.  [Doc. 34 at 7-10, 12].  However, as the Government correctly points out, consideration of the totality of the information in the corrected affidavit establishes that CI1's information about his interactions with Defendant and Defendant's criminal conduct, evidence of which was stored at the Target Location, is reliable.  The Magistrate Judge appropriately considered and relied on that information as supported by the surveillance and recordings of meetings between CI1 and Defendant at the Target Location.

"If an informant is mentioned in the affidavit, the affidavit must demonstrate the informant's 'veracity' and 'basis of knowledge.'"  United States v. Johnson, 444 Fed. Appx. 424, 425 (11th Cir. 2011) (quoting Gates, 103 S. Ct. at 2332).  "However, '[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant.'"  Id. (quoting United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002) (noting that "'sufficient independent corroboration of an informant's information'" can provide a basis for establishing

33

veracity) (citation omitted)); and see United States v. Foree, 43 F.3d 1572, 1576 (11th Cir. 1995) (corroborating evidence gathered by officers can provide indicia of reliability); United States v. Green, 2010 WL 11507504, at *5 (N.D. ga. April 13, 2010) (noting that the affiant did not rely solely on the informant but included "review of consensually monitored and recorded communications; oral and written reports from other officers; physical surveillance reported to him; and debriefings of confidential informants and other witnesses"), report and recommendation adopted by 2010 WL 1152214 (N.D. Ga. May 11, 2010).

Without dispute, CI1's background and criminal activities up to the time that he began cooperating with USSS agents in October 2013 for the purpose of benefitting himself in a current criminal case call into question his credibility. Defendant's criminal history included a 1997 conviction for theft by receiving stolen property, 1998 convictions for theft by receiving stolen property, for reckless conduct, for possession of a firearm by the convicted felon and carrying a concealed weapon, and second degree forgery, a 2002 conviction for driving under the influence, 2002 convictions for giving a false name to law enforcement officers and wilful obstruction of law enforcement officers and a 2004 conviction for violation of the Georgia RICO statute for which he received a sentence of eighteen years and was released on parole

34

in May 2009, as well as a 2002 revocation of his probation for engaging in new criminal conduct. (Affidavit ¶ 14); [Doc. 34-2]. In contrast, Defendant does not have a recorded criminal history. (Affidavit ¶ 17 (corrected)). CI1 also admitted to engaging in ongoing criminal conduct both with Defendant and separately. (Affidavit ¶¶ 20-22). However, Affiant provided in the affidavit grounds for the Magistrate Judge to find CI1's information about Defendant's criminal activities credible, including, the specificity related about Defendant's conduct, the first-hand knowledge of Defendant's conduct and the covert surveillance and recordings of CI1's conversations with Defendant about criminal activities. See Gates, 103 S. Ct. at 2330 (when it is clear from the affidavit that the informant was recounting events that he observed firsthand; the tip is entitled "to greater weight than might otherwise be the case"); United States v. Mitchell, 366 Fed. Appx. 6, 14 (11th Cir. 2010) ("An affidavit that recites the statements of an informant can provide a substantial basis for a finding of probable cause because an explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles the informant's tip to greater weight than might otherwise be the case.") (citation and internal quotation marks omitted); United States v. Deering, 296 Fed. Appx. 894, 899 (11th Cir. 2008) (noting that the informant "showed a detailed knowledge" and provided

35

personal observations of the activity under investigation); Martin, 297 F.3d at 1314 (noting that "'sufficient independent corroboration of an informant's information'" can provide a basis for establishing veracity) (citation omitted).  The court also notes the facts that CI1 admitted engaging in criminal conduct with Defendant and is not an anonymous source provide additional grounds establishing his veracity.  See United States v. Christmas, 222 F.3d 141, 144 (4th Cir. 2000) ("Unlike the anonymous tipster, a witness who directly approaches a police officer can also be held accountable for false statements."); C.B., By and Through Breeding, Jr. v. Driscoll, 82 F.3d 383, 388 (11th Cir. 1996) ("The tip was provided to administrators directly, rather than anonymously, and was thus more likely to be reliable because the student informant faced the possibility of disciplinary repercussions if the information was misleading."); United States v. Barfield, 507 F.2d 53, 58 (5th Cir. 1975); United States v. Villaverde-Leyva, 2010 WL 5579825, at *7 (N.D. Ga. December 9, 2010), report and recommendation adopted by 2011 WL 121932 (N.D. Ga. January 14, 2011).

During the two proffer sessions with CI1 before the covert surveillance and recordings, CI1 provided detailed and first-hand accounts of Defendant's criminal activities, implicating himself in the illegal conduct, and about the location of evidence associated with those activities.  As Affiant recounted in the affidavit, CI1

advised that he has known Defendant since at least 2009, described "[Defendant] as a black male, between 34 and 36 years old, 5 [foot]-10 [inches], 205 lbs., and single" and related that his friendship with Defendant "includes nightlife activities in the Atlanta area" and stated that Defendant "had the most sophisticated tax fraud system he knew and . . . was a computer technology guru." (Id. ¶¶ 18-19). CI1 stated that from 2009 until September 2013, Defendant created and maintained web sites for CI1 to use in various fraudulent schemes involving establishing fake auto dealerships to obtain fraudulent auto loans using stolen identities, in which the CI1 obtained over $280,000 in fraudulent auto loans, and to obtain personal identifying information for use in fraud schemes and assisted CI1 by setting up a static IP address required by LexisNexis which CI1 used to illicitly obtain identities. (Id. ¶¶ 20-22).

With respect to Defendant's tax fraud scheme, CI1 advised that Defendant created a tax fraud program which sends fraudulent returns using stolen identifies to the IRS and tracks the returns, automatically sets up and activates pre-paid cards for use to receive fraudulent tax refunds, stores stolen identities and uses them to automatically populate tax returns, and permits users to remotely log in via the Internet to allow use of the program to generate fraudulent tax returns and provides the login information for the program to allow others to generate fraudulent returns

37

and tracks those returns in order to compensate each user for submitting returns. Defendant also created a tutorial for the program and posted it on his server to reduce the time he spends assisting other users. (Id. ¶¶ 23-25). Defendant supplies users with programed modems to "create ghost IP addresses" and that allows for IP addresses to be changed to prevent the IRS from tracking a fraudulent tax return by IP address. (Id. ¶ 26). CI1 advised that Defendant can access the tax fraud program on his cell phone and that he has observed information related to fraudulent returns on Defendant's cell phone. (Id. ¶ 27). CI1 advised that Defendant told him, CI1, that Defendant "has filed fraudulent tax returns totaling between $500K and $700K in a single week." (Id. ¶ 28). CI1 advised that Defendant uses Walmart pre-paid cards to receive fraudulent tax refunds and he, CI1, has seen trash bags full of the cards in Defendant's residence. Defendant has the pre-paid money cards mailed to various addresses, including Columbus, Georgia, and Montana, has the cards "placed on hold" until loaded, and then has the cards mailed to Atlanta. Defendant obtains the cards and withdraws the funds from ATM machines. (Id. ¶ 29). CI1 also advised that he has seen computer towers in an upstairs bedroom of Defendant's residence and a computer in a back upstairs bedroom. (Id. ¶ 30).

As set forth in the affidavit, CI1, on October 31, 2013, provided the following additional detailed and first-hand information.  He advised that he sold Defendant a black 2013 Mercedes Benz E350.  (Id. ¶ 31).  He advised that Defendant lives alone in a "split-level" residence, with a carport with rooms located above, located off of Roosevelt Highway and Washington Road in South Atlanta.  (Id. ¶ 33).  Individuals, working from various town homes, assist Defendant by inputting stolen identifies, supplied by others, in the tax fraud program.  (Id. ¶ 34).  CI1 advised that Defendant uses the domain "punkmail.net" and that he, CI1, has used the email to communicate with Defendant to further their fraudulent schemes.  (Id. ¶ 35).  Defendant created a system to allow a pre-paid card loaded with a fraudulent tax refund to appear to have been used at various merchant service accounts to provide the appearance of legitimacy.  (Id. ¶ 36).  CI1 also stated that Defendant advised "that all successful fraudulent returns . . . filed from the previous year are filed again in January" and, as an example, advised CI1 that he successfully filed 700 fraudulent tax returns in one week last year using data from returns filed the prior year.  (Id. ¶ 37).  CI1 advised that, at the Cheetah Night Club, Defendant showed him a tax fraud application on Defendant's cell phone, a smart phone running the Android operating system, and showed him Defendant's earnings from some of the returns.  (Id. ¶ 38).  And about

39

two years ago, Defendant showed CI1 the tax fraud program tutorial.  (Id. ¶ 39).  CI1 advised that Defendant's main computer system is in an upstairs study at Defendant's residence.  (Id. ¶ 40).  CI1 also immediately and correctly identified Defendant from a photo array and drew a detailed sketch of the floor plan of Defendant's residence.  (Id. ¶¶ 41-42).

Affiant corroborated much of this information by setting forth in the affidavit the results of the covert surveillance and recordings of meetings between Defendant and CI1 at the Target Location.  In fact, even if none of the information provided in the proffers is considered in determining whether Magistrate Judge Brill had a "substantial basis" for concluding that probable cause existed, the information in the affidavit based on the covert surveillance and recordings satisfies this standard.  See Gates, 103 S. Ct. at 2331.  On November 25, 2013, while wearing an audio and video recording device, at the Target Location, following Defendant initially asking why CI1 was giving him three small, headshot photographs, CI1 asked Defendant to create three fake driver's licenses for CI1.  CI1 asked Defendant to have the driver's licenses, two from Florida and one from Tennessee, reflect the age of the persons between thirty and thirty-five years old.  Defendant discussed the price charged by a coconspirator who assists in preparing fake driver's licenses.  (Id. ¶ 43).  CI1 and

Defendant also discussed details of the fraudulent tax return scheme and about the tax fraud program.   Defendant stated that he used a list of stolen inmate identities provided by CI1 to file fraudulent returns but was not successful because the IRS caught the returns.   (Id. ¶ 44).   And CI1 provided further details to USSS agents learned from the meeting immediately after the meeting ended, including, that the server for the tax fraud program is called XL Host and costs $450.00 per month, that Defendant said he has 3,000 accounts (which CI1 understood to be pre-paid cards) ready to receive funds from false tax returns and that he had already filed 700 false returns, that the program is still on Defendant's server which Defendant can access from his cell phone, that Defendant said he "filed $300K in fraudulent tax return claims last week in a single batch[,]" that Defendant said he was also planning to mail paper returns in the coming month, and that Defendant said, the next day, he was going to various ATM's to withdraw cash from the pre-paid cards.   (Id. ¶ 45).

On December 9, 2013, CI1, wearing audio and video recording equipment, met with Defendant, who exited the Target Location, on the driveway and in the carport. CI1 provided Defendant with a Microsoft Surface Pro 2 (which had been purchased by USSS) for Defendant to load to provide CI1 with access to the tax fraud program. (Id. ¶ 46).  During the meeting, CI1 asked about the status of the fake drivers licenses,

41

and Defendant replied that his coconspirator was ready to make them but that he, Defendant, had forgotten to drop off the photographs.  Defendant also described "a 'bootleg' phone system that he set up on his computer" and advised that his computer had two phone accounts, one for legitimate calls and the other for "bootleg calls" in order to maintain anonymous communications for his tax fraud scheme.  Defendant discussed methods for filing fraudulent tax fraud returns using Turbo Tax and ProSeries.  (Id.).  Defendant also discussed a "fix implemented by the IRS" restricting the receipt of multiple refunds into the same bank account.  He described going to multiple ATM's to withdraw cash from the pre-paid cards loaded with fraudulent refunds.  He also described the tax fraud program to CI1 using his, Defendant's, laptop computer and showed how the program monitors user activities, specifically of individuals using the program to file fraudulent tax returns.  Defendant also discussed his database of bank accounts, some provided by CI1, being used to receive fraudulent refunds and that each account could receive two to five refunds a week to avoid detection by the IRS.  Defendant also discussed one user, Ice Urban, employed by Defendant to "push" fraudulent returns.  (Id.).  Defendant advised that he would configure the tax fraud program to allow CI1 to physically login and add bank accounts to receive fraudulent refunds.  Defendant stated that he needed more bank

42

accounts to receive refunds.  Defendant stated he had fraudulent refunds received or

pending in the amount of $21K and $25K and that he had an IRS tax insider feeding

him, Defendant, information to be able to file fraudulent returns undetected.  (Id.).

After the meeting, CI1 provided the following additional details.  He stated that the

web site www.burstlock.com was the interface used by Defendant on his laptop to

connect to the tax fraud program.   During the meeting, Defendant entered his

residence to retrieve a silver Dell mini-laptop, which was the laptop Defendant used

to create the tax fraud program, and used the laptop to connect via the web site to the

tax fraud program and to explain the program to CI1.  The first screen on the web site

was a login box for a username and password.  (Id. ¶¶ 48-49).  CI1 advised that, in the

program, he saw tabs for pending tax refunds highlighted in green (approximately 200

were pending), for bank accounts and for user activities by employees.  (Id.).  CI1

relayed that Defendant discussed obtaining 70,000 stolen identities for use in the tax

fraud scheme from a coconspirator, who obtained the identities from a computer

hacker, but that only about 10,000 of the identities were good to use.  (Id.).  CI1

advised that last year he gave Defendant ten bank accounts, set up with stolen

identities and fictitious business names, to use to receive fraudulent refunds and that

another person gave Defendant up to 200 such bank accounts.  (Id.).  Defendant

43

described for CI1 how he, Defendant, had been withdrawing cash from multiple ATM's using cards loaded with fraudulent tax refunds. (Id.). CI1 also described the motorcycle, a Suzuki GS-XR 750 series, parked in Defendant's carport. (Id.). And CI1 said that Defendant was to load the Microsoft Surface Pro 2 tablet with what is needed for CI1 to access www.burstlock.com and to be able to load fraudulent bank accounts and stolen identities in the tax fraud program for filing returns and receiving refunds. (Id.).

And on January 15, 2014, CI1, wearing recording equipment, met with Defendant at the Target Location. (Id. ¶ 51). Affiant stated that, during the meeting, Defendant generated a login for CI1 to use which would allow CI1 to input personal identifying and bank account information in the tax fraud program and provided the computer to CI1 and accessed the program on the computer. (Id.). After the meeting, CI1 met with USSS agents and, in their presence, accessed that tax fraud program on the computer via the web site www.burstlock.com. (Id. ¶ 52). Affiant witnessed CI1 login and observed a screen with multiple tabs, including "phone mgmt," videos," training videos," "bank accounts," and "aggregators." (Id.).

Based on the totality of the information provided in the corrected affidavit, Magistrate Judge Brill's decision that there was a fair probability that contraband or

evidence of the crimes listed in the affidavit would be found in the Target Location should be upheld.  See Jiminez, 224 F.3d at 1248 (the issuing judge is required to "'simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and the basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place'") (quoting Gates, 103 S. Ct. at 2332) (internal quotation marks omitted).  For all of these reasons, the court finds that Defendant is not entitled to a Franks hearing and that his motions to suppress should be denied.

**c.    Good Faith**

Furthermore, as the Government correctly argues, even if the corrected affidavit for the search warrant did not establish probable cause, the evidence seized from the Target Location should not be suppressed because the good faith exception to the exclusionary rule applies in this case.  [Doc. 38 at 12-14].  In United States v. Leon, 104 S. Ct. 3405 (1984), and Massachusetts v. Sheppard, 104 S. Ct. 3424 (1984), the Supreme Court established a good faith exception to the exclusionary rule where officers placed reasonably objective reliance on a search warrant later determined to be defective.  In United States v. Accardo, 749 F.2d 1477 (11th Cir. 1985), the

45

Eleventh Circuit Court of Appeals discussed the good faith exception established by the Supreme Court. With the exception of cases "where the issuing magistrate wholly abandoned his judicial role[,]" or where "a warrant [is] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]'" or where "a warrant may be so facially deficient – i.e., in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid[,]" the good faith exception applies. Id. at 1480 & n.4 (citations omitted). The good faith exception "require[s] suppression 'only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'" Id. at 1480 (quoting Leon, 104 S. Ct. at 3422). In making this decision, the totality of the circumstances surrounding issuance of the search warrant may be considered. Id. at 1481.

The court has already determined that Defendant failed to present sufficient evidence to make a substantial preliminary showing that Affiant either deliberately or with a reckless disregard for the truth included false, material information in the affidavit or omitted material information from the affidavit. And the search warrant for Defendant's residence was not "based on an affidavit 'so lacking in indicia of

46

probable cause as to render official belief in its existence entirely unreasonable[.]'"
Leon, 104 S. Ct. at 3421 (citation omitted).  The court notes that the affidavit
supporting the search warrant was not a "'bare-bone' statement of nothing more than
conclusory allegations" which the Supreme Court in Leon found indicative of
warrants falling within the third exception to the good faith doctrine.  See United
States v. Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998).  The affidavit included details
about Defendant's criminal conduct, based in large part on the covert surveillance and
recorded meetings with Defendant which also corroborated CI1's proffered account
of his relationship with Defendant and Defendant's activities - as well as the
supporting the conclusion that evidence of those criminal activities were probably in
the Target Location.   (Affidavit).   This affidavit presented much more than
conclusory, "bare-bone" assertions for consideration by the issuing judge.   The
affidavit provided factual details for the issuing judge to consider and evaluate.  The
law enforcement officers were, therefore, entitled to rely upon that evaluation and
determination that "given all the circumstances set forth in the affidavit before [the
judge], there [was] a fair probability that contraband or evidence of a crime [would]
be found in a particular place."  Gates, 103 S. Ct. at 2332.

     **d.**    **Conclusion**

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motions [Docs. 30, 34, 37] to suppress and for a <u>Franks</u> hearing be **DENIED**.

## II.   Remaining Motions

As noted, Defendant filed a motion [Doc. 32] to suppress statements; however, counsel for Defendant advised the court that the motion may be withdrawn. Accordingly, the court **RECOMMENDS** that the motion [Doc. 32] to suppress statements be **DENIED** as **MOOT**.  And pending before the court is Defendant's motion [Doc. 29] for a bill of particulars.  Counsel for the Government advises that, after meeting with counsel for Defendant, the parties resolved the bill of particulars. Accordingly, the court **GRANTS** the motion [Doc. 29] for a bill of particulars as agreed upon by the parties.

## III.   Conclusion

For these reasons, the court **RECOMMENDS** that Defendant's motions [Docs. 30, 34, 37] to suppress evidence seized during the execution of the search warrant for the Target Location and for a <u>Franks</u> hearing be **DENIED** and that Defendant's motion [Doc. 32] to suppress statements be **DENIED** as **MOOT**.

48

And, as agreed to by the parties, the court **GRANTS** Defendant's motion [Doc. 29] for a bill of particulars.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED AND RECOMMENDED** this 18th day of October, 2019.


_____
JANET F. KING
UNITED STATES MAGISTRATE JUDGE

49