IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **United States of America**<br><br>*v.*<br><br>**Kevin L. Kirton** | Criminal Action No.<br><br>1:19-CR-22-WMR-UNA<br><br>**United States' Motion for Detention** |

The United States of America, by Byung J. Pak, United States Attorney, and Samir Kaushal, Assistant United States Attorney for the Northern District of Georgia, moves for detention of defendant Kevin Kirton under 18 U.S.C. §§ 3142(e) and (f).

## Background

On November 19, 2020, a Grand Jury sitting in the Northern District of Georgia returned a second superseding indictment charging Kirton with nine new felony counts: three counts of witness tampering and six counts of obstruction of justice. *See* 18 U.S.C. §§ 1512(b)(1) and 1503. The new charges arise from phone logs and recordings obtained from the Robert A. Deyton Detention Facility (the "RAD Facility"). Those items show that Kirton spoke with pretrial detainee Everett Tripodis[1] to threaten and influence a witness, A.N. Tripodis is a friend

---

[1] Tripodis is charged in an unrelated case with one count of conspiracy, in violation of 18 U.S.C. § 371, three counts of interstate transport of a stolen vehicle, in violation of 18 U.S.C. § 2312, and one

of A.N. and, based on the calls, appears to be acting as a go-between for Kirton and A.N. Kirton also enlisted Tripodis to find someone who is incarcerated that would falsely take responsibility for Kirton's criminal conduct.

Phone log records from the RAD Facility for Tripodis show that, from August 13, 2019, until July 19, 2020, Kirton and Tripodis had 432 phone calls. (Phone Detail Report, attached as Exhibit 1.) Although many of the conversations are mundane—such as Kirton setting up three-way calls for Tripodis and Kirton checking Tripodis's e-mail account for him—there are numerous instances of Kirton witness tampering and obstructing justice on these calls.

## Argument

**1.    Eligibility of Case**

Kirton should be detained because there is (i) a serious risk that he will obstruct or attempt to obstruct justice and (ii) a serious risk that he will threaten, injure, or intimidate a prospective witness or juror, or attempt to do so. *See* 18 U.S.C. § 3142(f)(2)(B).

---

count of tampering with a vehicle identification number, in violation of 18 U.S.C. § 511(a), in *United States v. Tripodis et al.*, 1:18-CR-240.

## 2. Reasons for Detention

There is no condition or combination of conditions that will reasonably assure Kirton's appearance as required and the safety of witnesses in his case. *See* 18 U.S.C. § 3142(e)(1). Indeed, this case presents circumstances far beyond theoretical risks. There are recordings showing that Kirton has already witness tampered and obstructed justice—or attempted to do so—and poses a serious risk of continuing to do so as his trial date approaches. Moreover, Kirton's measures to tamper and obstruct justice show that he also poses a serious risk of taking other desperate measures to avoid justice, such as fleeing or escalating the witness tampering as his trial date approaches. Accordingly, Kirton should be detained. At Kirton's detention hearing, the government will present recordings to prove that Kirton poses a serious risk of flight and is a danger to witnesses in his case.[2]

### A. August 13, 2019 calls where Kirton instructs Tripodis to "twist" A.N.

On August 13, 2019, Kirton and Tripodis speak and, during the course of two calls, Kirton instructs Tripodis to threaten A.N. with publication of A.N.'s role in Kirton's case through the media and

---

[2] The government has provided the recorded jail calls referenced in this motion to defense counsel via e-mail and the government will present the recorded jail calls at the detention hearing.

publication of recordings Kirton has of A.N. Kirton discusses "bust[ing] [A.N.'s] bubble" by having Tripodis "remind" A.N. about "really what happened" and laments that A.N. was still "snitching":

> Kirton: Maybe you should bust his bubble because we already know what it is. This is the bubble. Number one, I have a discovery with videos with him doing the snitching. Number two, the radio station called me, one of the stations. He wanted me to come up there and I was like, "No, I'm not going to get on the radio and talk about anybody." But I still know the guy because my friend prints for the radio station. Okay. Number three, when I called [A.N.] about a year after this happened, he was: "Man, I was backed into a corner, and I started throwing punches."
>
> Then he started crying and he was apologizing because . . . , man, I wanted to come up there and bust your ass, "Why did you get me in all this trouble?" He said, "I was backed to a corner," and he started crying. This and that. What he doesn't know is I recorded that, because it was embarrassing.
>
> Tripodis: Are you serious?
>
> Kirton: Yes. Now, as far as embarrassing him right now, I'm a very nice guy.
>
> Tripodis: You are.

> Kirton: I'm a very, very nice guy. But I definitely wanted to hear what he had to say. And then he went on to saying that same conversation, "Man, those people in Florida, they're going to get, da da da da." I'm like, "He is still snitching." How are you going to be crying and then get to snitching? "I'm going to see a psychiatrist, man, and girls, . . .but those guys in Florida . . . ." If you have to remind him, you can remind him. So, otherwise, it'll be a nice, nice article about: "This is really what happened."

(Exhibit 2, "2019-08-13 1565732730_220_13_168_521.wav" at 8:32–10:03.) On another phone call that day, Kirton explains that he has his "payback" for A.N., an "exposé" on A.N. that would embarrass him in a way that he will never live down:

> Kirton: You already know. He's going to act the way he's going to act. And I'm not about slandering nobody, but Lord knows if I needed a headline, it would be a headline.
>
> Tripodis: Yeah, that would. So what do you want me to communicate with him?
>
> Kirton: Put it like this. If my case gets dismissed, could you imagine a very poorly written affidavit with things that are definitely not true in it? That's not even small claims court. It can go bigger than that.
>
> Tripodis: Yea. You can go 1983. You can go federal lawsuit.

5

Kirton: Exactly. Like all that stuff, I'm not interested in. I just want to get through this because I got a kid to have, another kid to have. And y'know, I'm trying to get married y'know. I've got things to do. And then on top of that, forget the lawsuit, it's just the headline. I don't need the lawsuit for real. Look at the headline. The headline is embarrassing enough. That's payback.

Tripodis: Yea, especially when you know he's going to be back on TV probably within the next year.

Kirton: Mmm hmm. Do you know how many people are like, "How did he get out and stuff?" Oh yea. Yea, you've got to remember how many people got a nice video disposition (sic) with him getting wired up, asking questions, being a . . . do boy for a minute. That's what he was doing.

Tripodis: Oh, wow, but they don't show him on the video. You could just hear him.

Kirton: He looks into the car mirror. He looks into the window. [Laughs]

Tripodis: No? For real?

Kirton: Yeah. He looks into the window, driving the car, talking to me. Oh yeah. Yea.

Tripodis: Aww man. S[***]. [Laughs]

> Kirton: Yea. Like come on, man. What you want to do? That's embarrassing by itself. I don't want nothing. His best people forget why, except for the people that are actually affected. But in this case, when people see that, then he will never live that down.
>
> Tripodis: Damn. Okay.
>
> Kirton: . . . Even right now, if he's in there right now and stuff like that was on the news, oh God. You've got the wrong thing on your papers, that isn't good.
>
> Tripodis: It's not. It's not. So I'm going to probably be reaching . . . talking to him . . . in the next . . .tomorrow, maybe tonight.
>
> Kirton: Hey, Hey. Like I said, the whole he backed me into a corner throwing punches and the little tiny moment of crying. And going to the psychologist and, "All I can do is f[***] girls." Oh yea. That little . . . thing alone along with everything else is, like, oh my gosh. I got a whole exposé.

(Exhibit 3, "2019-08-13 1565733700_220_12_158_828.wav" at 4:48–7:23.) Tripodis then notes: "When he knows you have that information, he's going to probably do whatever you want him to do." (*Id.* at 7:53–8:00.) Later, Kirton says: "Check with him to see if you can twist him. It ain't going to hurt him none, and it would just protect him more. . . .

7

He could wake up his brain . . . . Tell him . . . I beat up my big brother for real, in real life and I got one of those for him." (*Id.* at 10:43–11:08.)

### B. September 17, 2019 calls where Kirton threatens to give A.N. a "brotherly tap."

On September 17, 2019, Kirton and Tripodis have two phone calls where they discuss A.N. To start, Kirton confirms that Tripodis spoke to A.N. (Exhibit 4, "2019-09-17 1568769997_150_12_154_547.wav" at 4:55–5:16.) Kirton later alludes to a "plan" and says that A.N. should watch out for a "brotherly tap": "If there is any plan, sorry, y'know with your experience, if there's any support backing, boom, because it can't hurt him. Boom. Done. Pull the lever. Pull the lever and I'll think about not giving him a brotherly tap. Cause he know." (*Id.* at 9:32–9:55.)

On another call that day, Kirton states that nothing A.N. does now in terms of testimony can hurt A.N. and provides suggested testimony for A.N.:

> Tripodis: He's out now. What does it hurt him? He already got . . . whatever time cut, right?
>
> Kirton: No, it can't hurt him anything. Nothing. Nothing. It can't hurt him anything. As a matter of fact, it's not hurting him if he's telling the truth. He's not going against what he said because what he said was what I told him, which is correct, but what he also knew, he didn't say. Y'know, he didn't say that, y'know, Ron was cashing out stuff. He didn't know that Ron lived there, but, y'know, that could just pop up.

8

Tripodis: Right. Basically, he just needs to let them know some things that he omitted, which was basically—

Kirton: Exactly. The omissions. Especially with the card stuff because he was cashing out with him and he was using-- Ron was using my stuff and I didn't know what he was using it for at first. It was no big deal to me. And he was using my eBay too, and he was using my PayPal.

Tripodis: So he knew that. Okay, I get what you saying. I feel you. Aight. No problem. Well I have a way to communicate—

Kirton: So reasonable doubt is serious and this is all about reasonable doubt.

Tripodis: Right. And he can give that to you.

Kirton: Oh, yes. Oh yea.

Tripodis: Okay. All right. I didn't know all that. All right. All right.

Kirton: It's almost like he can clear up the omitted stuff in the affidavit to make it better. Like, it could be better.

Tripodis: Right. . . . You know how he operates now?

Kirton: What do you mean?

Tripodis: You know what type of person he is? He's not really the type of person. He's not altruistic. I might have to come at it with an angle of how—

Kirton: Oh, no, no. I told you the first angle. I'm not trying to [unintelligible] or anything.

Tripodis: Oh, hell yea. Ok, Ok. Aight, Yea, I feel you.

Kirton: You already mentioned that to him or no?

Tripodis: No, no, I didn't. I didn't. I didn't.

Kirton: Well you know what? You can mention it as if you already know what it is, and you have to check on it.

Tripodis: Okay.

Kirton: "You do know you did the stuff . . . ." Actually, you can do it however you want . . . . You could tell him honestly with the separation and disconnect, my payback was lined up. That was it. So that was it . . . . I've had my girlfriend be like, "No, don't do that. Just leave it alone." Y'know, like, I got good people around me to be like, "No." But the first time I did it was with the radio station. Back then, the radio station called me. The producer called me and wanted me to get on and slam him.

Tripodis: Right, I remember.

Kirton: And I denied that.

Tripodis: Your tactical too. You knew this day would come and maybe, y'know, nothing was coming of it at that time.

Kirton: Naw. Actually, no. That wasn't part of the tactics back then. That was just Japanese

stuff. You don't talk about other people. And a little religion, let the Lord handle your stuff.

Tripodis: You know he's going to be going back on or trying to go back on TV.

Kirton: Mmhmm. He's still going to have to be in that courtroom.

Tripodis: Man, but how is that going to look on TV? Oowee.

Kirton: Well, he's coming there for-- He ain't doing nothing. He's just a witness. He's just a witness. Really, he's just witnessing. He's witnessing the fact that the guy was doing it and he just knew it was in the house.

Tripodis: See, so basically, if he gave up—you saying if he was--

Kirton: Okay, put it like this. [A.N.] knew I lived in Camp Creek. He knew I was living over by the shopping center. That house was being renovated, like, it wasn't being touched. We were separating. I used to go over there once or twice. I had him meet me over there. That was it. So the other guy living there, he didn't know about. They have problems, [A.N.] wants to come in, I don't even tell them he's there. Big deal. As a matter of fact, they had so many problems, I had to squash it. I'm going to go after him. Y'know, we got him for 16G.

Tripodis: Damn.

Kirton: Yea. So he didn't know he was there. Boom. That's what it is. That's really all it is.

11

Tripodis: Okay. All right.

Kirton: The guy was there. He's the one who do the cards. He do all of that. Great. He's got a little case pending. Great. Got you. It makes perfect sense. Yea. Kevin talks about it, but he was really just selling the app. That's what I was doing. I was selling to app. I'm talking about what other people do. But, yea, the guy was sitting back there, he used my merchant account, but he used mine too. He used mine too.

He didn't tell me what it was for because he ain't tell to [A.N.] what it was for. I know that. That's one thing [A.N.] would say. He ain't tell me what it was for. He just said, "I'm doing the purchasing. He was going to transfer this, and that's what I did for him."

Tripodis: Exactly. . . . All we got to do is just remix, give them the original version, a clean version, and then ride off into the sunset.

Kirton: Yeah, but you know what? We can focus on what that version is so he can do a little reach or whatever, however, whatever. And this is not no holding off position. This is where we can't do no shake of hands right now. We don't have no time for that. But, y'know, I was solid once before and I need to, like I said, live my life real quick. And, uh, yea.

Tripodis: Okay.

Automated Voice: You have one minute remaining.

Tripodis: All right, sir. I'm on it. All right.

> Kirton: Please do.
>
> Tripodis: I'm waiting on somebody to send me something. It should be any day. I actually hit him up a couple of times, but I think he's in a class.
>
> Kirton: Either do that or let me know how to reach him so I can talk to him off the radar.
>
> Tripodis: Okay, I will. I'll let him know. I'll talk to him to see, y'know, how he feels. You know he's spooky. And he's not all the way out yet. He's still on—
>
> Kirton: Yea. Well, like I said, . . . the videos alone ain't good.
>
> Tripodis: [Laughs]

(Exhibit 5, "2019-09-17 1568770973_150_12_198_372.wav" at 9:15–15:40.)

### C. December 26, 2019 call where Kirton demands a "quid pro quo" from A.N.

During a call on December 26, 2019, Kirton asks whether "A.P."—a name that Kirton and Tripodis sometimes use to refer to A.N.—checks his e-mail directly and Tripodis says he does. (Exhibit 6, "2019-12-26 1577377559_220_12_199_67.wav" at 3:00–3:19.) The two discuss how the government probably wants to use A.N. as a witness and how A.N. can help Kirton "rectify the situation." (*Id.* at 3:20–4:55.) Kirton, in discussing the recordings he has of A.N., speaks about how he does not want to create "drama" and is not "vindictive," but there is a "quid pro

13

quo" on that. (*Id.* at 4:55–6:14.) Kirton then gives some suggested testimony for A.N. (*Id.* at 6:14–6:45.)

### D. October 5 and 19, 2019 calls where Kirton instructs Tripodis to find an inmate to take responsibility for Kirton's crimes.

On October 5, 2019, Kirton tells Tripodis to find someone to take responsibility for Kirton's crimes. Specifically, Kirton instructs Tripodis to find a "lifer" to "step up for [him]" in exchange for money:

> Kirton: Remember when I told you the guy that was at the house, the stuff that he ain't know who left it there, but it belong to somebody?
>
> Tripodis: Yea.
>
> Kirton: Uh, yea, I need to send you, cause I thought you knew the guy. The guy that wanted the money on his books that wanted to step up for me. The lifer. So, when you find one, let me know.
>
> Tripodis: Yea, yea, yea, yea, yea, yea.
>
> Kirton: You know?
>
> Tripodis: Yea, yea.
>
> Kirton: Makes sense right?
>
> Tripodis: Yea, it does actually. [Unintelligible] Ok.
>
> Kirton: Sometimes it's real simple and I was waiting for you to call. But that's about it. But,

> but remember, its five years statute of limitations that already ran out, so it's not really a step up. It's more like a: there you go.

(Exhibit 7, "2019-10-05  1570327494_5000_12_175_779.wav" at 2:54–3:48.) Kirton requests a "candidate" from Tripodis, says that he can provide a "5K departure" for that candidate (in the context of these calls these words appear to refer to a payment of $5,000), and provides the timeline of the charged criminal conduct so that Tripodis can find a candidate who was not incarcerated at the time of the crimes. (*Id.* at 6:43–8:20, 14:15–14:50.) On October 19, 2019, Kirton returns to this topic and asks if Tripodis has found a candidate yet—a "5K component"—and discusses the statutes of limitations for the charges. (Exhibit 8, "2019-10-19 1571507894_220_12_169_681.wav" at 5:15–8:21.)

Aside from demonstrating that Kirton is obstructing justice, these calls provide powerful evidence of Kirton's guilt on all counts in the indictment. *See* 18 U.S.C. § 3142(g)(2) (stating that weight of evidence should be considered when deciding whether to detain defendant). Kirton would not be looking for a "lifer" to "step up" if he was innocent of the charged crimes.

### E. No conditions of release can be fashioned to ensure Kirton's appearance for trial and safety of witnesses.

Detention is crucial here to prevent Kirton from fleeing prior to his trial and to prevent Kirton from further witness tampering and

15

obstruction of justice. To start, there is a serious risk that Kirton will flee prior to his trial. Only the most devious defendants, those that hold outright contempt for the law, seek to witness tamper and obstruct justice. Here, Kirton has gone to the extreme: looking for an incarcerated "fall guy" to take responsibility for his crimes. As Kirton's trial date nears, he will become even more desperate and may flee. And Kirton has the means to successfully do so. Notably, when Kirton's home was searched during this investigation, law enforcement found debit cards for accounts held in other people's names and identification documents for other individuals. Kirton could obtain or generate similar items again prior to his trial and flee using an alias.

Aside from the risk of flight, no conditions of release can prevent Kirton from harming witnesses through witness tampering and obstruction of justice. Communications between Kirton and Tripodis cannot be adequately policed because there are a multitude of means through which they can communicate, including the following: (i) another inmate can act as a go-between for Kirton and Tripodis; (ii) Tripodis could use another inmate's PIN code for the RAD Facility phone system, which would prevent effective monitoring of their communications; (iii) Kirton and Tripodis can exchange messages via any other individual who commonly speaks with Tripodis; and (iv) Kirton and Tripodis can exchange messages via mail. If one form of

communication is blocked or discovered, the two can quickly transition to another form of communication.

More importantly, no conditions of release will prevent Kirton from contacting A.N., with or without Tripodis. Unlike Tripodis, A.N. is not currently detained. Kirton could communicate with A.N. to witness tamper and obstruct justice through a multitude of means, such as: telephone calls via prepaid cellular phones; prepaid cellular hotspots using throwaway or self-destructing e-mail addresses; encrypted messaging applications, such as Telegram, Wickr, and WhatsApp; video teleconferencing applications, like Skype and WhatsApp; and human intermediaries. And given Kirton's technological sophistication there are certainly other means of communication he could create or establish that no probation officer would be able to detect.

The recorded jail calls show that Kirton cannot be trusted to follow a Court order to not contact A.N. He has already crossed that red line in astounding fashion. The audacity with which Kirton has operated also almost guarantees that, as his trial date approaches, and the pressure on him intensifies, he will find new methods of obstructing justice and ramp up his threats against A.N. And while Kirton has focused on A.N. for now, that could change. His focus could shift to other witnesses as the trial approaches. Detention is needed to preserve the integrity of Kirton's trial.

### 3. Time for Detention Hearing

The United States requests the Court conduct the detention hearing at arraignment.

>Respectfully submitted,
>
>BYUNG J. PAK
>>*United States Attorney*
>
>/s/ SAMIR KAUSHAL
>>*Assistant United States Attorney*
>>Georgia Bar No. 935285
>>Samir.Kaushal@usdoj.gov

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

        Jay Shreenath
        *Counsel for Defendant Kevin Kirton*

November 25, 2020

        /s/ SAMIR KAUSHAL
        SAMIR KAUSHAL
        *Assistant United States Attorney*